Stephen A. Broome (Cal. Bar No. 314605)
stephenbroome@quinnemanuel.com
John W. Baumann (Cal. Bar No. 288881)
jackbaumann@quinnemanuel.com
Laurenne M. Babayan (Cal. Bar No. 348075)
laurennebabayan@quinnemanuel.com
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Nicolas G. Keller (N.Y. Bar No. 5549522) (*pro hac vice*)
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel:  (212) 849 7000
Fax:  (212) 849 7100

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TIMOTHY MILLAR, individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br>  vs.<br><br>EXPRESS TECHNOLOGIES, LTD.,<br><br>   Defendant. | 8:25-cv-01273-FWS-DFM<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT UNDER RULE 12(b)(1) & (b)(2) AND, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**<br><br>Hearing Date: October 23, 2025<br>Time:    10:00 AM<br>Action Filed: June 13, 2025<br>Judge:   Hon. Fred W. Slaughter<br>Trial Date:  None Set |

1
2

# **TABLE OF CONTENTS**

**Page**

3
4

NOTICE OF MOTION ...................................................................................1

5

MEMORANDUM OF POINTS AND AUTHORITIES...............................2

6

BACKGROUND ............................................................................................3

7
    A.    ExpressVPN Provides VPN and Privacy Services................................3

8
    B.    Millar Subscribed to ExpressVPN for Two Months in 2022 .................4

9
          1.    Millar Subscribed to ExpressVPN in September 2022 ...............4

10
          2.    Millar's Subscription Renewed Once in October 2022...............6

11
12
    C.    The ExpressVPN Advertisements Millar Allegedly Relied on Did Not Exist When He Signed Up........................................................6

13
14
    D.    The Operative ExpressVPN Terms of Service Require Binding Arbitration and Delegate the Question of Arbitrability.........................7

15
          1.    TOS Automatic Renewal Terms .................................................8

16
          2.    TOS Mandatory Binding Arbitration .........................................8

17
18
LEGAL STANDARD.....................................................................................9

19
ARGUMENT.................................................................................................10

20
I.    THE COURT SHOULD DISMISS FOR LACK OF JURISDICTION .........10

21
    A.    The Court Lacks Personal Jurisdiction Over ExpressVPN .................10

22
23
          1.    ExpressVPN Did Not Purposefully Direct the Suit-Related Conduct at California................................................11

24
25
          2.    Millar's Claims Do Not Arise Out of ExpressVPN's Forum Contacts........................................................................13

26
27
          3.    Exercising Personal Jurisdiction Would Be Unreasonable and Offend Traditional Notions of Fair Play and Substantial Justice....................................................................14

28

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

B.   The Court Lacks Subject Matter Jurisdiction ......................................15

C.   The Court Also Lacks Equitable Jurisdiction .....................................18

II.   IN THE ALTERNATIVE, THE COURT SHOULD COMPEL ARBITRATION .........................................................................................19

A.   Millar Agreed to Arbitrate His Claims ...............................................19

B.   The Arbitration Agreement Delegates Arbitrability Disputes..............20

CONCLUSION .......................................................................................................22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Alexander v. Kujok*,
    158 F. Supp. 3d 1012 (E.D. Cal. 2016) ............................................................15

*ASUS Computer Int'l v. InterDigital, Inc*,
    2015 WL 5186462 (N.D. Cal. Sept. 4, 2015) ..................................................21

*Boschetto v. Hansing*,
    539 F.3d 1011 (9th Cir. 2008) ..........................................................................9

*Briskin v. Shopify*,
    135 F.4th 739 (9th Cir. 2025) .............................................................. 12, 13, 14

*Calder v. Jones*,
    465 U.S. 783 (1984) .........................................................................................11

*Chiron Corp. v. Ortho Diagnostic Sys. Inc.*,
    207 F.3d 1126 (9th Cir. 2000) ........................................................................20

*Doe v. Call-On Doc*,
    2025 WL 1677632 (S.D. Cal. June 13, 2025) ..........................................11, 13

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ...........................................................................................9

*Geographic Expeditions, Inc. v. Est. of Lhotka ex rel. Lhotka*,
    599 F.3d 1102 (9th Cir. 2010) ........................................................................19

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022) .........................................................................17

*Heiting v. Marriott Int'l, Inc.*,
    743 F. Supp. 3d 1163 (C.D. Cal. 2024) ..........................................................14

*In re Holl*,
    925 F.3d 1076 (9th Cir. 2019) ........................................................................19

*Johnson v. Pluralsight, LLC*,
    236 F. Supp. 3d 1176 (E.D. Cal. 2017) ..........................................................17

-iii-

*Pavlovich v. Superior Court*,
    29 Cal. 4th 262 (2002) ........................................................................9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................9, 15

*Mayron v. Google, Inc.*,
    2016 WL 1059373 (Cal. Super. Feb. 26, 2016)................................17

*Mayron v. Google LLC*,
    54 Cal. App. 5th 566 (Ct. App. 6th Dist. 2020)................................16

*McKee v. Audible, Inc.*,
    2018 WL 11263238 (C.D. Cal. Mar. 12, 2018)................................17

*Moody v. Textron Inc.*,
    2025 WL 2025597 (C.D. Cal. July 2, 2025)......................................11

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*,
    460 U.S. 1 (1983)...............................................................................10

*Nacarino v. Chobani, LLC*,
    668 F. Supp. 3d 881 (N.D. Cal. Feb. 4, 2022) ..................................18

*Patrick v. Running Warehouse, LLC*,
    93 F.4th 468 (9th Cir. 2024)..............................................................21

*Prima Paint Corp. v. Flood & Conklin Mfr. Co.*,
    388 U.S. 395 (1967)....................................................................10, 20

*Regueiro v. FCA US, LLC*,
    671 F. Supp. 3d 1085 (C.D. Cal. 2023) ............................................17

*Rendon v. T-Mobile USA, Inc.*,
    747 F. Supp. 3d 1314 (C.D. Cal. 2024) ............................................21

*Rose Day LLC v. Women of Tomorrow Mentor*,
    2025 WL 1039555 (C.D. Cal. Mar. 3, 2025)...............................11, 12

*Roz v. Nestle Waters N. Am., Inc.*,
    2017 WL 132853 (C.D. Cal. Jan. 11, 2017) ...............................15, 16

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004)..............................................10, 11, 13

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

*Smith v. Spizzirri*,
    601 U.S. 472 (2024)........................................................................20

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020)...................................................17, 18

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..........................................................................9

*Steel v. United States*,
    813 F.2d 1545 (9th Cir. 1987)........................................................11

*Stewart v. Screen Gems-EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015)...............................................7

*Stout v. Grubhub*,
    2021 WL 5758889 (N.D. Cal. Dec. 3, 2021)..................................20

*Surkhabi v. Tesla, Inc.*,
    2022 WL 19569540 (C.D. Cal. Oct. 27, 2022)...............................19

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)....................................................................9, 17

*Walden v. Fiore*,
    571 U.S. 277 (2014)..................................................................11, 14

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015)..........................................16

*Wiseley v. Amazon.com, Inc.*,
    709 F. App'x 862 (9th Cir. 2017)...................................................19

*Zeller v. Optavia, LLC*,
    2022 WL 17858032 (S.D. Cal. Dec. 22, 2022)..............................17

*Zeller v. Optavia LLC*,
    2024 WL 1207461 (S.D. Cal. Mar. 14, 2024) ...............................18

## **Statutes**

9 U.S.C. § 1 ......................................................................................9

9 U.S.C. § 3 ..............................................................................10, 20

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

Cal. Bus. & Prof. Code § 17204 ...................................................................15

Cal. Bus. & Prof. Code § 17535 ...................................................................15

Cal. Bus. & Prof. Code § 17603 .............................................................16, 17

Cal. Civ. Code § 1770...................................................................................18

Cal. Civ. Proc. Code § 410.10 .......................................................................9

## **Other Authorities**

AAA, *Consumer Arbitration Rules*, R-14(a) ...............................................8

Fed. R. Civ. Proc. 12(b) ........................................................................1, 7, 15

ICDR, *International Dispute Resolution Procedures* ................................8, 20, 21

Local Rule 7-3 ................................................................................................1

U.S. Constitution Article III .....................................................................9, 15

www.express-vpn.com/tos ...............................................................................7

www.expressvpn.com/tos .................................................................................7

## NOTICE OF MOTION

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 23, 2025 at 10:00 A.M. PST or at the next date and time that is available for the Court, Defendant Express Technologies, Ltd. ("ExpressVPN") will move this Court to dismiss the Complaint (ECF No. 1) filed by Plaintiff Timothy Millar for lack of personal and subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and (b)(2) or, in the alternative, to compel arbitration and stay the action. ExpressVPN so moves based on the following Memorandum of Points and Authorities, the argument of counsel, and any additional material as may be submitted to and accepted by the Court before its decision.

Pursuant to Local Rule 7-3, before making this motion, counsel for the parties held a pre-motion conference on August 7, 2025. The parties did not resolve the issues that would have avoided the need for this motion.

DATED: August 22, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Stephen A. Broome*

Stephen A. Broome
John W. Baumann
Laurenne M. Babayan
Nicolas G. Keller (*pro hac vice*)

*Attorneys for Defendant*

-1-

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Timothy Millar ("Millar") brings claims against Defendant Express Technologies, Ltd. ("ExpressVPN") under California's Automatic Renewal Law ("ARL"), Unfair Competition Law ("UCL"), and False Advertising Law ("FAL") on the alleged basis that he did not know he would be charged monthly for virtual private network ("VPN") services, despite ExpressVPN's clear and conspicuous disclosures—including the disclosures "billed every month" and "billed monthly" that appear prominently in Millar's own exhibits—and despite the fact that a VPN is, by its nature, a service consumers generally use on an ongoing basis.  Merits aside, his claims do not belong in this Court, for several reasons.

**First,** the Court lacks personal jurisdiction over ExpressVPN, a foreign company that is not at home in the State of California.  Millar has not—and cannot—establish that his claims arise out of ExpressVPN's forum-related activities during the relevant time period, which were, at most, severely limited in nature.  Instead, Millar voluntarily subscribed to ExpressVPN's globally available online service, and his personal jurisdiction theory rests entirely on his own California residency and on an advertisement that did not exist until long after Millar cancelled his subscription. Under Ninth Circuit precedent, neither is a basis for personal jurisdiction.

**Second,** the Court also lacks subject matter jurisdiction over this dispute because Millar fails to allege injury in fact and thus lacks standing.  Nowhere does Millar claim that he was deprived of the VPN services he paid for, that he did not obtain the full benefit of his bargain, or that he otherwise suffered a cognizable injury. Instead, he points to the ARL's "unconditional gift" provision as the supposed statutory basis for such an injury.  However, to the extent this "unconditional gift" provision of the ARL gives rise to an injury at all, it applies only to tangible goods—not intangible digital services like VPN subscriptions—and is therefore inapplicable.

**Third,** the Court lacks equitable jurisdiction.  Millar frames his claims as wholly equitable in nature, but the reality is that he has an adequate remedy at law

-2-

through the California Consumer Legal Remedies Act ("CLRA"), which provides damages for the same alleged violations. Millar cannot manufacture equitable jurisdiction by strategically omitting legal claims.

*Finally*, even if the Court were to find it has personal and subject matter jurisdiction, Millar agreed to resolve his claims in arbitration, including any threshold disputes as to arbitrability. Accordingly, to the extent the Court exercises jurisdiction, it should do so only to compel Millar's claims to arbitration.

# **BACKGROUND**

This case arises from Millar's two-month long subscription to ExpressVPN's services from September 10, 2022, to November 12, 2022, for which Millar paid $12.95 per month. Millar does not allege that, at any point during this time, his VPN service was interrupted, that he did not use the VPN service, that he submitted any complaint about the service, or that he was otherwise dissatisfied with the service he received. Nevertheless, in a lawsuit filed over two-and-a-half years later, Millar contends that the second of the two $12.95 payments he made caused him harm and violated the ARL, UCL, and FAL.

## A. **ExpressVPN Provides VPN and Privacy Services**

ExpressVPN is an established provider of online privacy and security solutions, including through its flagship VPN subscription service. *See* Declaration of Jack Buckley ¶ 4 (hereinafter, "Buckley Decl."). A VPN uses software to encrypt users' internet connections and provide a secure tunnel between users' devices and the internet. *Id.* ¶ 5. Often used by employers and organizations to enable remote employees to securely access institutional networks, VPNs are also available to individuals for their everyday internet browsing. *Id.* ¶ 8. ExpressVPN's VPN service is available entirely online and without the need for any hardware or other tangible product. *Id.* ¶ 9. ExpressVPN is dedicated to privacy and digital security, having launched initiatives like the ExpressVPN Rights Center. *Id.* at ¶ 7. ExpressVPN's VPN service is also routinely audited for compliance with strict security and privacy

-3-

standards. *Id.* ¶ 6. ExpressVPN is a British Virgin Islands ("BVI") company. *Id.* ¶ 3; Compl. at ¶ 7.

**B.    Millar Subscribed to ExpressVPN for Two Months in 2022**

1.    Millar Subscribed to ExpressVPN in September 2022

On September 10, 2022, Millar signed up for a monthly subscription to the ExpressVPN service and paid the monthly fee of $12.95 for his first month. Compl. ¶¶ 4, 34. In doing so, Millar clicked through the ExpressVPN sign-up and checkout page, which was split into "3 easy steps." *Id*. ¶ 24. At "Step 1," the page invited visitors to "Select a plan that works for you" from three different subscription "VPN plans," with those subscriptions described as follows: (i) "1 Month . . . $12.95 per month . . . Billed every month;" (ii) "12 Months + 3 Months FREE . . . $6.67 per month . . . Billed once for 15 months (including 3 free months), then every 12 months;" and (iii) "6 Months . . . $9.99 per month . . . Billed every 6 months." *Id*. ¶¶ 24-25 & Ex. 2. At "Step 2," a user would enter their email address. *Id*. ¶ 26 & Ex. 2. And at "Step 3," entitled "Select your preferred method of payment," the subscription nature of the VPN service was described once again right above the "Join Now" button, with language specific to the plan chosen by the user at Step 1. *Id*. For example, for the month-to-month plan Millar chose, the notice stated, "ExpressVPN 1-month plan, billed monthly ($12.95/month)." *Id*. ¶¶ 26-27. This text was in black font against a white background, which provides the maximum possible contrast ratio between any two colors. The above-described format and content of the ExpressVPN checkout process made no reference to California.

Millar completed all three of the above-described steps—and thus saw the numerous disclosures at Step 1 and Step 3 that his selected subscription would renew monthly—clicked the "Join Now" button, and then received a confirmation email stating, in relevant part, "PRICE 12.95 USD billed monthly." *Id*. ¶ 31 & Ex. 3. Despite the repeated and clearly legible statements regarding the monthly billing cadence of his selected subscription during the purchase and post-purchase stages,

-4-

Millar alleges that somehow the recurring nature of the VPN subscription was "[u]nbeknownst to him." *Id*. ¶ 4; *see also id.* ¶¶ 31, 34, 36.

Millar argues that ExpressVPN's stylistic choices of font colors and sizes are to blame, *id.* ¶¶ 25, 27, but his characterizations are contradicted by the snapshot of the checkout flow appended to his Complaint, which is in normal resolution—unlike the degraded excerpts that he pasted into his Complaint. *Compare id.*, Ex. 2, *and* Buckley Decl., Ex. 1 (Sept. 10, 2022),[1] *with* Compl. ¶¶ 24, 26. For instance, the font of the text "per month," "Billed every month," "Billed once for 15 months (including 3 free months), then every 12 months," "Billed every 6 months," and "ExpressVPN 1-month plan, billed monthly ($12.95/month)" was no smaller than other important notices on the webpage, including "30-day money-back guarantee," "All amounts shown are in USD," and "Privacy guarantee: We do not share your information and will contact you only as needed to provide our service," *id.*, Ex. 2—none of which Millar complains or asserts were obscured, even though they were the same size.

Millar's allegation that, in "Step 3," the words "billed monthly" (part of the phrase "ExpressVPN 1-month plan, billed monthly ($12.95/month)") are in "faded grey text," *id.* ¶ 27, is similarly inaccurate, as that text is clearly black when viewed in normal resolution. *Id.*, Ex. 2; *see also* Buckley Decl., Ex. 1. In any event, as to the language Millar complains of that is actually grey, such "grey text" was used abundantly throughout the page. *See* Compl. ¶¶ 24-27. This includes the grey text used for key data entry fields (*e.g.*, "Your email address," "First Name," "Last Name," "Card Number") and even for emphasizing that one discounted rate was a significant drop from the usual price, which for comparison was in grey and crossed out (*i.e.*,

---

[1]  *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015) ("When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(2), a court may consider extrinsic evidence—that is, materials outside of the pleadings, including affidavits submitted by the parties.").

"$12.95"), *id.*, Ex. 2; Buckley Decl., Ex. 1, belying the suggestion that ExpressVPN's use of grey text was intended to obscure.

### 2.    Millar's Subscription Renewed Once in October 2022

One month after Millar signed up, on October 10, 2022, he was charged the renewal fee of $12.95 for his second month of service, consistent with the numerous above-described notifications that the subscription would be billed on a monthly basis.  Compl. ¶ 35.  On October 22, 2022, Millar allegedly "cancelled the service so he would not be charged again."  *Id.*  Millar does not allege any difficulty in cancelling his subscription, and he does not claim to have sought any customer service support or refunds.  *See id.* ¶¶ 34-37.

Millar claims that "[i]f ExpressVPN had complied with the ARL and made clear that it was going to automatically charge Mr. Millar in this way, he would not have signed up in the first place or would have cancelled before he was automatically charged."  *Id.* ¶ 36.  Although Millar's only alleged injury is the $12.95 he paid for the second month, he conclusorily asserts that he "has no adequate remedy at law" and that "[t]he equitable claims asserted (the UCL and FAL) offer relief, including restitution, that is more prompt, certain, and efficient than legal damages."  *Id.* ¶ 37. He does not explain why.

### C.    **The ExpressVPN Advertisements Millar Allegedly Relied on Did Not Exist When He Signed Up**

Millar argues the "Court has personal jurisdiction over ExpressVPN because it both purposefully avails itself of California and purposefully directs its activities here. ExpressVPN exploits the California market, to enter contracts with California consumers."  *Id.* ¶¶ 9-10.  Millar points to two categories of purported evidence to support this assertion.  First, Millar describes a Google keyword ad for ExpressVPN that appeared on Google Search when he (or his counsel) recently searched for the words "ExpressVPN" and "California."  *Id.* ¶ 10.  Millar also describes the corresponding ExpressVPN webpage that appears when the Google advertisement is

-6-

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

clicked. *Id.* ¶¶ 11-12. Millar omits, however, that ***these ads did not exist*** when Millar signed up in September 2022. Buckley Decl. ¶ 19.

Second, Millar alleges that, "[t]o service the California businesses it solicits, ExpressVPN controls physical servers located in California (in Los Angeles, San Francisco, and Santa Monica). For these servers, ExpressVPN's related contracts would be centered in California (the location of the server)." Compl. ¶ 13. Millar appears to be referring to the servers that host VPN services ("VPN Servers"). However, Millar does not allege that his claims arise out of ExpressVPN's contracts for VPN Servers, the location of the VPN Servers, or any issues relating to the VPN Servers. Rather, he complains about ExpressVPN's websites which were hosted by separate servers (the "Website Servers"), the location of which was determined not by ExpressVPN but rather "by the third-party webhosting service provider hired by ExpressVPN to host the websites such that they are accessible globally." Buckley Decl. ¶ 18.

**D.** **The Operative ExpressVPN Terms of Service Require Binding Arbitration and Delegate the Question of Arbitrability**

On Millar's sign-up and checkout page, the following notice appeared directly below the "Join Now" button: "By submitting this form, you agree to our Terms of Service." Buckley Decl., Ex. 1; *see also* Compl., Ex. 2 (Dec. 1, 2022). This sentence appeared in black font against a white background (which, as aforementioned, has the highest possible contrast ratio between two colors), with ample whitespace setting it apart from all other text. And within the sentence, the words "Terms of Service" were hyperlinked, green in color, and starkly underlined. Buckley Decl., Ex. 1; *see also* Compl., Ex. 2. The Terms of Service ("TOS"), available in September 2022 at the hyperlinks www.expressvpn.com/tos and www.express-vpn.com/tos, described both the automatic renewal terms and the applicable dispute resolution provisions—including an arbitration agreement. Buckley Decl. ¶ 14 & Ex. 2 (Sept. 10, 2022).

### 1. TOS Automatic Renewal Terms

Section 4 of the TOS, titled "Subscriptions," complemented the offer-selection and checkout notices by stating that "[w]hen supported by your payment method, plans renew automatically by default at the completion of the billing term;" that "[b]y default, the renewal term is for the same duration as the billing term for the original subscription;" that "[t]he subscription fee will be charged automatically to the payment method you last selected;" that "to discontinue automatic renewal [customers] may sign in to the Site and turn off auto-renewal or email us at support@expressvpn.com;" and that "by default, auto-renewal is turned on when [customers] use a payment method that supports auto-renewal (such as a credit card or Paypal [*sic*]), and turned off when [customers] use a payment method that does not support auto-renewal (such as Bitcoin)." *Id*., Ex. 2 § 4. Additionally, the TOS stated that "ExpressVPN reserves the right to amend subscription fees or institute new fees at any time upon reasonable advance notice posted on the Site or sent via email. Any changes to the pricing will not affect the Subscriber's current subscription period and will become effective upon subscription renewal." *Id*.

### 2. TOS Mandatory Binding Arbitration

Section 15 of the TOS, titled "Arbitration," contains an arbitration agreement, requiring that "[a]ll disputes arising out of or relating to this Agreement or the use of the Site or Services shall be finally settled under the Rules of Arbitration ('Rules') of the International Centre for Dispute Resolution (ICDR) by one arbitrator ('Arbitrator') appointed in accordance with said Rules." *Id*., Ex. 2 § 15. The ICDR is the global division of the American Arbitration Association ("AAA"), and, as such, the two arbitral forums (collectively known as "AAA-ICDR") share substantially the same rules and procedures. This includes a jurisdictional provision that delegates arbitrability disputes directly to the arbitrator. *See* AAA, *Consumer Arbitration Rules*, R-14(a), www.adr.org/media/tiifv2ft/consumer_rules_web.pdf (Sept. 1, 2014) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including

-8-

any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."); ICDR, *International Dispute Resolution Procedures*, Art. 21(1), www.icdr.org/sites/default/files/document_repository/ICDR_Rules_1.pdf ("The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to arbitrability, to the existence, scope, or validity of the arbitration agreement(s), . . . without any need to refer such matters first to a court.").

## LEGAL STANDARD

**Personal Jurisdiction.** When no federal statute governs personal jurisdiction, courts apply forum state law. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). California exercises personal jurisdiction coextensive with federal due process standards. *See Pavlovich v. Superior Court*, 29 Cal. 4th 262, 268 (2002) ("California courts may exercise personal jurisdiction on any basis consistent with the Constitutions of California and the United States." (citing Cal. Civ. Proc. Code § 410.10)). A plaintiff bears the burden of demonstrating that his or her allegations would establish a prima facie case for personal jurisdiction. *See Boschetto*, 539 F.3d at 1015.

**Article III Standing.** To establish standing under the U.S. Constitution, a plaintiff must prove an "injury in fact" that is causally linked to the conduct complained of and would be redressed by a decision in plaintiff's favor. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[B]are procedural violation[s], divorced from any concrete harm . . . do[] not suffice for Article III standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The plaintiff bears the burden to prove subject matter jurisdiction exists. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990).

**Arbitration.** The Federal Arbitration Act ("FAA") applies where, as here, the arbitration agreement appears in a contract involving interstate commerce. 9 U.S.C. § 1; *cf.* Compl. ¶¶ 11, 13 & Ex. 1 (at some unspecified point in time, "ExpressVPN

-9-

control[led] physical servers located in California (in Los Angeles, San Francisco, and Santa Monica)" but also "24 U.S. server locations" and in "105 Countries worldwide"). "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). If a claim is subject to arbitration, a court lacks authority to address the merits of that claim. *See Prima Paint Corp. v. Flood & Conklin Mfr. Co.*, 388 U.S. 395, 400 (1967). Under Section 3 of the FAA, a court must stay the case until the arbitration has concluded. 9 U.S.C. § 3.

## <u>ARGUMENT</u>

## I.    THE COURT SHOULD DISMISS FOR LACK OF JURISDICTION

### A.    <u>The Court Lacks Personal Jurisdiction Over ExpressVPN</u>

ExpressVPN is a BVI company that offers its services around the world. Buckley Decl. ¶¶ 3-4. It has no offices in the United States. *Id.* ¶ 3. To exercise specific personal jurisdiction over a non-resident defendant like ExpressVPN, the Ninth circuit applies a three-prong test: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (cleaned up).

"The plaintiff bears the burden of satisfying the first two prongs of the test. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. If the plaintiff succeeds . . . the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citations omitted). "[M]ere injury to a forum resident is not

-10-

a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014); *see Doe v. Call-On Doc*, 2025 WL 1677632, at *5 (S.D. Cal. June 13, 2025) ("A court must look 'to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" (citing *Walden* post-*Briskin*)).

For a court to exercise specific personal jurisdiction over a defendant, the requisite contacts with the forum under the three-prong test must have existed at the time the alleged violations occurred—here, September and October 2022. *See Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("When a court is exercising specific jurisdiction over a defendant, 'arising out of or related to the defendant's contacts with the forum,' the fair warning that due process requires arises not at the time of the suit, but when the events that gave rise to the suit occurred." (citation omitted)); *Rose Day LLC v. Women of Tomorrow Mentor*, 2025 WL 1039555, at *8 (C.D. Cal. Mar. 3, 2025) ("[T]he personal jurisdiction analysis . . . requires defendant to have already established contacts with the forum at the time of the relevant events.").

1. ExpressVPN Did Not Purposefully Direct the Suit-Related Conduct at California

The *Calder* three-part "effects" test—drawn from the Supreme Court's decision *Calder v. Jones*, 465 U.S. 783 (1984)—governs the assessment of "purposeful direction." *Schwarzenegger*, 374 F.3d at 805. Under that test, a plaintiff must establish the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, [and] (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* A plaintiff's assertion of having "suffer[ed] an injury in the forum state alone is insufficient to demonstrate purposeful direction." *Moody*

-11-

*v. Textron Inc.*, 2025 WL 2025597 at *4 (C.D. Cal. July 2, 2025) (cleaned up). Millar has not and cannot make the required *Calder* showings, particularly on the second and third parts.

Millar relies heavily on ExpressVPN's purported advertising aimed at California. Compl. ¶¶ 10-12. But, even putting aside that it is **Millar (or his counsel)** who sought out California-related advertising by searching Google for "ExpressVPN California," the ExpressVPN webpage regarding California servers to which this search led simply did not exist in September or October 2022. Buckley Decl. ¶ 19. As a necessary consequence, these advertisements cannot have been "expressly aimed at the forum state" at the time, thereby failing the second part of the *Calder* test. *See, e.g., Rose Day LLC*, 2025 WL 1039555 at *8 (requiring "contacts with the forum **at the time of the relevant events**" (emphasis added)).

The only other conduct Millar identifies that could conceivably have been "expressly aimed at the forum state" is that ExpressVPN used VPN Servers located in California at the time. Compl. ¶ 13. But, Millar does not contend that his alleged harm has anything to do with the location of the VPN Servers (which are located around the world), thereby failing the third part of the *Calder* test. The mere presence of VPN Servers in California does not tie ExpressVPN's conduct to Millar's claims, particularly where those California VPN Servers were available on a worldwide basis and were, in any event, separate from the Website Servers which host the ExpressVPN customer signup webpages that Millar challenges. *See* Buckley Decl. ¶ 16 ("In September 2022, ExpressVPN offered global access to VPN servers in 94 countries, meaning that, should they so choose, non-California subscribers anywhere in the world could use California servers with California IP addresses, and California subscribers could use non-California servers with non-California IP addresses. ExpressVPN does not control a subscriber's decision to select a particular server or location."); *id.* ¶ 18. In sum, as of September and October 2022, ExpressVPN did not

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

"purposefully direct[] . . . [wrongful] conduct toward California." *Briskin v. Shopify*, 135 F.4th 739, 755 (9th Cir. 2025).

The Ninth Circuit's recent *en banc* decision in *Briskin v. Shopify* does not dictate a contrary conclusion. *Id.* In that case, plaintiff Briskin had purchased a product from an online retailer. *Id.* at 747. Unbeknownst to Briskin, the retailer used defendant Shopify's payment checkout service. *Id*. Shopify allegedly used this access, "while knowing that the device Briskin was using to shop was located in California," to affirmatively reach into that device to "surreptitiously implant[] cookies that permanently remained on Briskin's device, tracked its physical location, and collected data regarding Briskin's online shopping activity." *Id*. at 746. Briskin also alleged that "Shopify used the resulting data to compile a consumer profile that Shopify marketed widely, including to many California merchants." *Id*. Briskin had no opportunity to consent to or opt out of Shopify's data collection, had not sought out Shopify, and had no reason to know or suspect that his decision to interact with the retailer's website would result in Shopify's permanent data mining cookies being installed on his device, allegedly in violation of data privacy laws. *Id.* at 746-49. Accordingly, the nexus between Shopify's conduct and Briskin's claims was clear— it was ***Shopify's*** conduct (installing trackers without consent on devices within California) that gave rise to Briskin's data privacy claims. Under those highly specific circumstances, the Ninth Circuit found that specific personal jurisdiction over Shopify existed. *Id.* at 762. In contrast, none of these *Briskin* factors are present here, where Millar simply went online to obtain VPN services from a foreign company that provides services globally pursuant to TOS governed by BVI law.

        2.    <u>Millar's Claims Do Not Arise Out of ExpressVPN's Forum Contacts</u>

The second prong of the specific personal jurisdiction test requires that Millar's claims "arise[] out of or relate[] to the defendant's forum-related activities." *Schwarzenegger*, 374 F.3d at 802. This requirement ensures that the forum-related

-13-

1  contacts are not only purposeful, but also meaningfully connected to the claims at
2  issue. *Id.* at 803-05.

3        Millar cannot satisfy this prong. He alleges no facts indicating that
4  ExpressVPN's conduct targeted him—or anyone—in California in September 2022.
5  *See Call-On Doc, Inc.*, 2025 WL 1677632, at *7 (granting motion to dismiss for lack
6  of specific personal jurisdiction where the plaintiff failed to plausibly allege
7  defendant's contacts with California).  Rather, it is ***Millar*** who affirmatively sought
8  out and obtained the ExpressVPN subscription services.  *See* Compl. ¶ 34.  But
9  Millar's conduct cannot give rise to personal jurisdiction over ExpressVPN; only
10  ExpressVPN's own conduct can create personal jurisdiction.  *See Walden*, 571 U.S.
11  at 285 ("[T]he plaintiff cannot be the only link between the defendant and the
12  forum."); *Heiting v. Marriott Int'l, Inc.*, 743 F. Supp. 3d 1163, 1170 (C.D. Cal. 2024)
13  ("[I]t is the defendant's contacts with the forum that are relevant" to specific
14  jurisdiction analysis (citing *Walden*, 571 U.S. at 284)).  And, as shown above, Millar's
15  claims do not arise out of or relate to ExpressVPN's limited contacts with California
16  as of September and October 2022—namely, the alleged "control" of VPN Servers
17  within the State.  *See* Compl. ¶¶ 11, 13.

18        3.    Exercising Personal Jurisdiction Would Be Unreasonable and
19            Offend Traditional Notions of Fair Play and Substantial Justice

20        Even if Millar could satisfy the first two prongs of the specific personal
21  jurisdiction analysis (which he cannot), exercising personal jurisdiction over
22  ExpressVPN would be unreasonable and offend traditional notions of fair play and
23  substantial justice.  Courts apply a seven-factor balancing test to assess
24  reasonableness:  "(1) the extent of the defendant's purposeful interjection into the
25  forum state's affairs; (2) the burden on the defendant of defending in the forum; (3)
26  the extent of conflict with the sovereignty of the defendant's state; (4) the forum
27  state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of
28  the controversy; (6) the importance of the forum to the plaintiff's interest in

-14-

convenient and effective relief; and (7) the existence of an alternative forum." *Briskin*, 135 F.4th at 761. Because Millar fails to adequately allege that ExpressVPN purposefully directed its conduct to California or that his claims arise out of ExpressVPN's alleged California contacts, his contract is not governed by California law, and because he agreed to resolve his claims elsewhere, it would be unreasonable and offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over ExpressVPN.

## B.  The Court Lacks Subject Matter Jurisdiction

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," without which a court lacks subject matter jurisdiction. *Lujan*, 504 U.S. at 560; *see Alexander v. Kujok*, 158 F. Supp. 3d 1012, 1017 (E.D. Cal. 2016) ("Where a plaintiff lacks standing to bring a claim, courts lack jurisdiction to hear that claim, and a motion to dismiss under Rule 12(b)(1) is appropriate."). In addition to the injury in fact requirement under Article III of the U.S. Constitution, the laws Millar invokes (the UCL and FAL) also impose their own statutory standing requirements. Cal. Bus. & Prof. Code § 17204 (UCL) ("Actions for relief pursuant to this chapter shall be prosecuted exclusively . . . by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."); *see also id.* § 17535 (FAL) (applying the same standard for false advertising claims).

The Court lacks subject matter jurisdiction over this dispute because Millar fails to allege injury in fact or that he "lost money or property" within the statutory meaning. *See Roz v. Nestle Waters N. Am., Inc*., 2017 WL 132853, at *6 (C.D. Cal. Jan. 11, 2017) ("To proceed with their UCL and FAL claims, . . . 1) the Plaintiffs must have suffered an injury-in-fact; and 2) the Plaintiffs must have lost money or property as a result of unfair competition."). Millar's theory of standing rests on the premise that he was charged for a second month of ExpressVPN's services without consent, in violation of the ARL. Compl. ¶¶ 34-36. But Millar does not suggest that

-15-

1   ExpressVPN failed to provide the services for which he paid.  *See id.* ¶ 35.  He does
2   not allege that the services he received were deficient, or that they were worth less
3   than what he paid.  Nor does he allege that he attempted to use the service but was
4   denied access, or even that he did not use the second month of service.  In short, Millar
5   received precisely what he paid for—two months of VPN services—and thus obtained
6   the benefit of his bargain.  *See Roz*, 2017 WL 132853, at *7 ("[P]aying money for a
7   product, while technically a 'loss' of that money, does not necessarily qualify as an
8   injury.  The money has changed hands, but the payer has received something of equal
9   or greater value.  Therefore, not all payments are injuries, and not all induced
10  payments satisfy the 'lost money or property' prong of the UCL and FAL.").  That
11  Millar later decided he would not have made the purchase had he read the disclosures
12  he was shown does not transform a completed and undisputed exchange of value into
13  a cognizable injury in fact or economic loss under California law.  *See generally*
14  *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1094 (C.D. Cal. 2015) ("[B]eing induced
15  to purchase a product one would not otherwise have purchased is not loss of money
16  or property within the meaning of the statute as long as one still receives the benefit
17  of the bargain.").

18          Millar's attempt to invoke the ARL's "unconditional gift" provision to cure this
19  defect is unavailing.  *See* Compl. ¶ 23 ("So if a company charges a consumer for an
20  automatically renewing subscription, in violation of the ARL, the charges are illegal
21  and must be refunded.").  The relevant provision states that, "[A]ny **goods, wares,**
22  **merchandise, or products** [sent] to a consumer, under a[n] . . . automatic renewal of
23  a purchase, without first obtaining the consumer's affirmative consent . . . shall for all
24  purposes be deemed an unconditional gift to the consumer, who may use or dispose
25  of the same . . . without any obligation whatsoever."  Cal. Bus. & Prof. Code § 17603
26  (emphasis added).  There is a split of authority regarding whether the "unconditional

27
28

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

gift" provision can confer the constitutional or statutory injury required for standing, with the more compelling opinions holding that it cannot.[2]

But, critically, even assuming *arguendo* that the "unconditional gift" provision in the ARL could confer standing under certain circumstances, it applies only where a defendant delivers **tangible goods** to a consumer in violation of the statute. *Johnson v. Pluralsight, LLC*, 236 F. Supp. 3d 1176, 1183 (E.D. Cal. 2017) (§ 17603 "applies only to tangible products that are shipped to a consumer, and not to intangible services."), *aff'd in part, rev'd in part on other grounds*, 728 F. App'x 674 (9th Cir. 2018); *see McKee v. Audible, Inc.*, 2018 WL 11263238, at *18, n. 15 (C.D. Cal. Mar. 12, 2018) ("*Roz* involved shipments of water and thus, unlike the present case[,] resolved the standing issue based on the unconditional gifts provision in § 17603, which might not apply to [Audible Credits]."). Because what Millar purchased from ExpressVPN is a subscription for online services, the "unconditional gift" provision simply does not apply. *See Mayron v. Google, Inc.*, 2016 WL 1059373, at *3 (Cal. Super. Feb. 26, 2016) (Whereas "a consumer could keep a good or product that is sent in violation of the [ARL], . . . there is nothing to keep when it is only a service that is provided."), *aff'd*, 54 Cal. App. 5th 566. Therefore, Millar cannot invoke it as a means of circumventing constitutional or statutory standing requirements.

---

[2]  *Compare Roz*, 2017 WL 132853, at *7 ("When the [d]efendant then collected money in return for that 'gift,' it injured the Plaintiffs because it took money that the Plaintiffs did not owe. Therefore, the charges must qualify as an injury."), *with Mayron v. Google LLC*, 54 Cal. App. 5th 566, 576 (Ct. App. 6th Dist. 2020) ("The *Roz* court's analysis ignores the requirement that the consumer's injury must be caused by . . . the defendant's failure to provide the required disclosures. Lack of a causal link between the underlying statutory violation and the nature of the plaintiff's loss precludes standing."), *and Zeller v. Optavia, LLC*, 2022 WL 17858032, at *9 (S.D. Cal. Dec. 22, 2022) ("[T]he ARL's unconditional gift provision does not independently confer standing . . . as the consumer's injury must be . . . caused by the defendant's failure to provide the required disclosures."); *see also TransUnion LLC*, 594 U.S. at 440 ("[B]are procedural violation[s] . . . do[] not suffice for . . . standing.").

## C.     <u>The Court Also Lacks Equitable Jurisdiction</u>

"In order to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022); *see also Regueiro v. FCA US, LLC*, 671 F. Supp. 3d 1085, 1099 (C.D. Cal. 2023). Accordingly, as the Ninth Circuit held in *Sonner v. Premier Nutrition Corp.*, equitable restitution is unavailable when a plaintiff seeks the same monetary relief through equity that is available through a legal damages claim, particularly where that relief would constitute "the same amount of money for the exact same harm" measured by the same metric, such as "a full refund of the purchase price." 971 F.3d 834, 844 (9th Cir. 2020).

But that is exactly what Millar seeks here, given he plainly has an adequate remedy at law (*i.e.*, damages of $12.95 for the second month charge). As courts have recognized time and again, "violations of the ARL are actionable under CLRA subdivisions (a)(5) and (a)(9)." *Zeller v. Optavia LLC*, 2024 WL 1207461 at *6 (S.D. Cal. Mar. 14, 2024); *see* Cal. Civ. Code § 1770. Where, as here, a plaintiff "may pursue a CLRA damages claim seeking a full refund," there is "an adequate remedy at law," which precludes equitable jurisdiction. *Id.* at *10. The same principle applies here. Millar cannot manufacture equitable jurisdiction by voluntarily declining to plead a CLRA claim, because his decision to do so does not establish the inadequacy of that legal remedy. *See, e.g.*, *Sonner*, 971 F.3d at 845 (plaintiff's "strategic[] cho[ice] to amend her complaint on the eve of trial to drop her [CLRA] damages claim" did not establish inadequacy of legal remedies allowing her to pursue UCL claim); *Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 895-96 (N.D. Cal. Feb. 4, 2022) ("*Sonner* teaches that a plaintiff . . . cannot create an inadequacy of a legal remedy by eliminating its availability by taking volitional action.").

Millar conclusorily asserts that he "has no adequate remedy at law" because the equitable claims purportedly "offer relief, including restitution, that is more prompt,

-18-

certain, and efficient than legal damages." Compl. ¶ 37. He does not explain why—because there is no logical explanation. Indeed, to the extent he has alleged harm at all—he has not—it is in the form of the $12.95 he was charged for his second month of VPN services. Compl. ¶ 4. It is difficult, if not impossible, to conceive how legal damages would not be sufficient to compensate Millar for this alleged monetary injury.

Because all of Millar's claims are equitable in nature, and because the Court cannot grant equitable relief where legal relief is available, the Court lacks equitable jurisdiction in this case.

## II.   IN THE ALTERNATIVE, THE COURT SHOULD COMPEL ARBITRATION

If the Court concludes it has jurisdiction over this matter, it should compel arbitration in accordance with the parties' agreement to arbitrate. *See Geographic Expeditions, Inc. v. Est. of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1106 (9th Cir. 2010) ("[A] federal court has jurisdiction over a petition to compel arbitration if the federal court would have jurisdiction over the underlying substantive dispute.").

### A.   <u>Millar Agreed to Arbitrate His Claims</u>

At the time he subscribed for ExpressVPN's service, ExpressVPN provided clear, conspicuous notice that doing so required Millar to agree to ExpressVPN's TOS, and Millar affirmatively clicked the action button signifying his assent to the agreement, including the arbitration provision. *See* Buckley Decl. ¶ 12.

"Federal courts . . . have recognized the general enforceability of . . . online agreements that require affirmative user assent." *In re Holl*, 925 F.3d 1076, 1085 (9th Cir. 2019) (citations omitted). Indeed, courts in the Ninth Circuit consistently find assent under circumstances materially identical to those alleged here. *See, e.g., Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862, 864 (9th Cir. 2017) ("The notices on Amazon's checkout and account registration pages, which alerted Wiseley that clicking the corresponding action button constituted agreement to the hyperlinked

-19-

[Conditions of Use], were in sufficient proximity to give him a 'reasonable opportunity to understand' that he would be bound by additional terms."); *Surkhabi v. Tesla, Inc.*, 2022 WL 19569540, at \*3 (C.D. Cal. Oct. 27, 2022) ("[Plaintiff] admits before clicking the 'Place Order' button, there is an option to click an underlined hyperlink labeled 'Model X Order Agreement.' . . . [Plaintiff] had sufficient opportunity to see and review the arbitration agreement. . . . Tesla cannot be faulted for [plaintiff's] failure to read the document containing the arbitration clause when it was readily available."); *Stout v. Grubhub*, 2021 WL 5758889, \*2 (N.D. Cal. Dec. 3, 2021) ("When a customer creates an account with Grubhub (whether via the mobile app or the website), she is required to consent to its Terms of Use. . . . In addition, each time a customer places an order . . . a customer must agree to the Terms of Use. . . . Thus, the Terms of Use . . . apply.").

Because there can be no dispute Millar agreed to arbitrate his claims against ExpressVPN, they must be sent to arbitration and this action should be stayed pending completion of any arbitration. *See* 9 U.S.C. § 3; *Prima Paint Corp*, 388 U.S. at 400 (explaining courts lack authority to address the merits of claims subject to arbitration); *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). Further, as shown below, Millar agreed to delegate arbitrability questions to the arbitrator. Accordingly, the FAA limits the Court's role to determining whether a valid arbitration agreement exists between the parties. *See Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the answer is "yes"—and it is—the Court may go no further and must compel arbitration. *Id.*

## B. The Arbitration Agreement Delegates Arbitrability Disputes

Millar's arbitration agreement provides that "[a]ll disputes arising out of or relating to this Agreement or the use of the Site or Services shall be finally settled under the Rules of Arbitration ('Rules') of the International Centre for Dispute

-20-

Resolution (ICDR) by one arbitrator ('Arbitrator') appointed in accordance with said Rules."  Buckley Decl., Ex. 2 § 15.  These ICDR Rules empower the arbitrator to decide all threshold issues, including disputes related to the scope or validity of the arbitration agreement itself.  Specifically, Article 21 of the ICDR Rules provides that, "[t]he arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to arbitrability, to the existence, scope, or validity of the arbitration agreement(s), or with respect to whether all of the claims, counterclaims, and setoffs made in the arbitration may be determined in a single arbitration, without any need to refer such matters first to a court."  ICDR, *Int'l Disp. Resol. Procedures*, Art. 21(1) (amended and effective March 1, 2021).

"Under federal law, the incorporation of a particular set of arbitration rules—such as the ICDR rules—that provide for the arbitrator to decide questions of arbitrability 'constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability.'" *ASUS Computer Int'l v. InterDigital, Inc*, 2015 WL 5186462, at *3 (N.D. Cal. Sept. 4, 2015) (citation omitted); *see also Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 480–81 (9th Cir. 2024) ("Courts have found that parties clearly delegated arbitrability where they incorporated an arbitrator's arbitration rules in the agreement." (cleaned up)); *Rendon v. T-Mobile USA, Inc.*, 747 F. Supp. 3d 1314, 1320 (C.D. Cal. 2024) ("[T]he incorporation of the AAA rules constitutes clear and unmistakable evidence Plaintiff agreed to arbitrate arbitrability, even if she was an unsophisticated party.").  So, too, here.

Because the parties "clearly and unmistakably" agreed to delegate questions of arbitrability to the arbitrator, to the extent Millar raises challenges, for example, to the scope, enforceability, or validity of his agreement, those challenges must be submitted to, and decided by, the arbitrator.

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

1

**<u>CONCLUSION</u>**

2

For the foregoing reasons, the Court should dismiss these proceedings for lack

3

of jurisdiction or, in the alternative, compel it to arbitration.

4

5    DATED:  August 22, 2025                QUINN EMANUEL URQUHART &

6                                           SULLIVAN, LLP

7

8                                      By    */s/ Stephen A. Broome*

9                                           Stephen A. Broome (Cal. Bar No. 314605)

10                                          stephenbroome@quinnemanuel.com
                                            John W. Baumann (Cal. Bar No. 288881)

11                                          jackbaumann@quinnemanuel.com
                                            Laurenne M. Babayan (Cal. Bar No.

12                                          348075)

13                                          laurennebabayan@quinnemanuel.com
                                            865 South Figueroa Street, 10th Floor

14                                          Los Angeles, California 90017-2543

15                                          Telephone:  (213) 443-3000

16                                          Facsimile:   (213) 443-3100

17                                          Nicolas G. Keller (N.Y. Bar No. 5549522)

18                                            (*pro hac vice*)
                                            nicolaskeller@quinnemanuel.com

19                                          295 5th Avenue, 9th Floor

20                                          New York, New York 10016
                                            Tel:  (212) 849 7000

21                                          Fax:  (212) 849 7100

22                                          *Attorneys for Defendant*

23

24

25

26

27

28

Defendant's Motion to Dismiss the Complaint and, in the Alternative, to Compel Arbitration

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Express Technologies, Ltd., certifies that this brief contains 6,908 words, which complies with the word limit of L.R. 11-6.1.

DATED:  August 22, 2025

*/s/ Stephen A. Broome*
Stephen A. Broome