Stephen A. Broome (Cal. Bar No. 314605)
stephenbroome@quinnemanuel.com
John W. Baumann (Cal. Bar No. 288881)
jackbaumann@quinnemanuel.com
Laurenne M. Babayan (Cal. Bar No. 348075)
laurennebabayan@quinnemanuel.com
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Attorneys for Defendant*

*[Continued on next page]*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TIMOTHY MILLAR and MARCO MARTINEZ, each individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>EXPRESS TECHNOLOGIES, LTD.,<br><br>        Defendant. | 8:25-cv-01273-FWS-DFM<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED COMPLAINT UNDER RULE 12(b)(1), (b)(2), & (b)(6) AND, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**<br><br>Hearing Date:  December 5, 2025<br>Time:            10:00 AM<br>Action Filed:   June 13, 2025<br>Judge:           Hon. Fred W. Slaughter<br>Trial Date:     None Set |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nicolas G. Keller (N.Y. Bar No. 5549522)*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel:  (212) 849 7000
Fax:  (212) 849 7100
(*Admitted *Pro Hac Vice*)

*Attorneys for Defendant*

-i-

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION ................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...........................2

BACKGROUND ........................................................................................3

    A.    ExpressVPN Provides VPN and Privacy Services ...............................3

    B.    Plaintiffs Purchased Subscriptions After Receiving Notice That The Subscriptions Would Automatically Renew ...................................4

        1.    Millar's Monthly Subscription ...................................................4

        2.    Martinez's Yearly Subscription ..................................................4

        3.    ExpressVPN Provided Repeated Autorenewal Notices ..............5

    C.    ExpressVPN's Terms of Service Also Disclosed the Automatic Renewal Terms and, as to Millar, Required Arbitration ......................6

        1.    TOS Automatic Renewal Terms ..................................................7

        2.    Millar Agreed to Mandatory Binding Arbitration ......................7

LEGAL STANDARD .................................................................................8

ARGUMENT ..............................................................................................9

I.    THE COURT SHOULD DISMISS FOR LACK OF JURISDICTION ..........9

    A.    The Court Lacks Personal Jurisdiction Over ExpressVPN ..................9

        1.    No Purposeful Direction .........................................................10

        2.    There Is No Nexus Between Plaintiffs' Claims and ExpressVPN's Alleged Contacts ..............................................14

        3.    Exercising Personal Jurisdiction Would Be Unreasonable ........14

    B.    The Court Lacks Subject Matter Jurisdiction ....................................15

    C.    The Court Also Lacks Equitable Jurisdiction ....................................17

II.    IN THE ALTERNATIVE, THE COURT SHOULD COMPEL ARBITRATION AS TO MILLAR ....................................................18

    A.    Millar Agreed to Arbitrate His Claims ..............................................18

    B.    The Arbitration Agreement Delegates Arbitrability Disputes .............19

1

III.    IN ANY EVENT, THE FAC SHOULD ALSO BE DISMISSED FOR
        FAILURE TO STATE A CLAIM......................................................20

2

3

        A.    Plaintiffs' Claims Sounding in Fraud Fail the "Reasonable
              Consumer" Test and the "Particularity" Requirement of FRCP
              9(b)..............................................................................20

4

5

        B.    Plaintiff's Remaining UCL Claims Also Fail ......................21

CONCLUSION .................................................................................23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 8:25-cv-1273
Defendant's Motion to Dismiss the FAC

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### <u>Cases</u>

4

*ASUS Computer Int'l v. InterDigital, Inc*,
  2015 WL 5186462 (N.D. Cal. Sept. 4, 2015) ...................................20

5

6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................9

7

*Boschetto v. Hansing*,
  539 F.3d 1011 (9th Cir. 2008)......................................................8

8

9

*Briskin v. Shopify*,
  135 F.4th 739 (9th Cir. 2025)................................................ 13-14

10

11

*Calder v. Jones*,
  465 U.S. 783 (1984)..................................................................10

12

13

*Chiron Corp. v. Ortho Diagnostic Sys. Inc.*,
  207 F.3d 1126 (9th Cir. 2000).....................................................20

14

15

*Doe v. Call-On Doc*,
  2025 WL 1677632 (S.D. Cal. June 13, 2025)..........................10, 14

16

17

*Eidmann v. Walgreen Co.*,
  522 F. Supp. 3d 634 (N.D. Cal. 2021)......................................21, 23

18

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)...................................................................8

19

20

*Geographic Expeditions, Inc. v. Est. of Lhotka ex rel. Lhotka*,
  599 F.3d 1102 (9th Cir. 2010)......................................................19

21

22

*Guzman v. Polaris Indus. Inc.*,
  49 F.4th 1308 (9th Cir. 2022).......................................................18

23

24

*In re Holl*,
  925 F.3d 1076 (9th Cir. 2019)......................................................19

25

26

*Johnson v. Pluralsight, LLC*,
  236 F. Supp. 3d 1176 (E.D. Cal. 2017) ..........................................17

27

28

-iv-

*Los Angeles Turf Club, Inc. v. US Racing*,
    2025 WL 2019948 (C.D. Cal. May 15, 2025) ...................................................13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...................................................................................8, 15

*Mayron v. Google, Inc.*,
    2016 WL 1059373 (Cal. Super. Feb. 26, 2016)...............................................18

*Mayron v. Google LLC*,
    54 Cal. App. 5th 566 (Ct. App. 6th Dist. 2020)...............................................17

*McKee v. Audible, Inc.*,
    2018 WL 11263238 (C.D. Cal. Mar. 12, 2018)................................................17

*Moody v. Textron Inc.*,
    2025 WL 2025597 (C.D. Cal. July 2, 2025)....................................................10

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*,
    460 U.S. 1 (1983)..............................................................................................9

*Patrick v. Running Warehouse, LLC*,
    93 F.4th 468 (9th Cir. 2024)...........................................................................21

*Prima Paint Corp. v. Flood & Conklin Mfr. Co.*,
    388 U.S. 395 (1967)....................................................................................9, 20

*Prolacta Bioscience, Inc. v. Prolact Ltd.*,
    2025 WL 2078270 (C.D. Cal. June 18, 2025) ................................................12

*Regueiro v. FCA US, LLC*,
    671 F. Supp. 3d 1085 (C.D. Cal. 2023) ..........................................................18

*Roz v. Nestle Waters N. Am., Inc.*,
    2017 WL 132853 (C.D. Cal. Jan. 11, 2017) ..............................................16, 17

*Rutter v. Apple Inc.*,
    2022 WL 1443336 (N.D. Cal. May 6, 2022) ....................................................21

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004).................................................................9, 10, 14

*Smart v. Nat'l Collegiate Athletic Ass'n*,
    2023 WL 4827366 (E.D. Cal. July 27, 2023) ..................................................18

-v-

*Smith v. Spizzirri*,
   601 U.S. 472 (2024).................................................................20

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020)......................................................18

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)..................................................................8

*Stewart v. Screen Gems-EMI Music, Inc.*,
   81 F. Supp. 3d 938 (N.D. Cal. 2015)..............................................5

*Surkhabi v. Tesla, Inc.*,
   2022 WL 19569540 (C.D. Cal. Oct. 27, 2022)...................................19

*Tan v. Quick Box, LLC*,
   2020 WL 7226440 (S.D. Cal. Dec. 8, 2020).....................................22

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)..............................................................8, 17

*Walden v. Fiore*,
   571 U.S. 277 (2014)............................................................10, 14

*Walkingeagle v. Google, LLC*,
   2024 WL 4379734 (9th Cir. Oct. 3, 2024).......................................20

*Warner v. Tinder Inc.*,
   105 F. Supp. 3d 1083 (C.D. Cal. 2015)...........................................16

*Wilkison v. Wiederkehr*,
   101 Cal. App. 4th 822 (Cal. Ct. App. 2002)......................................18

*Wiseley v. Amazon.com, Inc.*,
   709 F. App'x 862 (9th Cir. 2017)..................................................19

*Zeller v. Optavia, LLC*,
   2022 WL 17858032 (S.D. Cal. Dec. 22, 2022)..................................17

*Zeller v. Optavia LLC*,
   2024 WL 1207461 (S.D. Cal. Mar. 14, 2024) ...................................22

### **<u>Statutes</u>**

9 U.S.C. § 1 .........................................................................8

9 U.S.C. § 3 ...................................................................................................9, 20

Cal. Bus. & Prof. Code § 17204 ..........................................................................15

Cal. Bus. & Prof. Code § 17535 ..........................................................................15

Cal. Bus. & Prof. Code § 17603 ..........................................................................17

Cal. Civ. Code § 1780(a) .....................................................................................15

Cal. Civ. Proc. Code § 410.10 ...............................................................................8

## **Other Authorities**

AAA, *Consumer Arbitration Rules*, R-14(a)
    (Sept. 1, 2014) .................................................................................................8

C.D. Cal. Local Rule 7-3......................................................................................1

Fed. R. Civ. Proc. 12(b) .......................................................................................1

ICDR, *International Dispute Resolution Procedures*, Art. 21
    (Mar. 1, 2021)...........................................................................................7, 20

U.S. Constitution, Art. III ..............................................................................8, 15

# NOTICE OF MOTION

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 5, 2025, at 10:00 A.M. PST or at the next date and time that is available for the Court, defendant Express Technologies Ltd. ("ExpressVPN") will move this Court to dismiss the First Amended Complaint (ECF No. 24) for lack of personal and subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and (b)(2), as well as failure to state a claim under Rule 12(b)(6)—or, in the alternative, to compel arbitration and stay the action as to plaintiff Millar. ExpressVPN so moves based on the following Memorandum of Points and Authorities, the argument of counsel, and any additional material as may be submitted to and accepted by the Court before its decision.

Pursuant to Local Rule 7-3, before making this motion, counsel for the parties held a pre-motion conference on September 30, 2025. The parties did not resolve the issues that would have avoided the need for this motion.

DATED: October 10, 2025          QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP


                                 By: */s/ Stephen A. Broome*
                                 Stephen A. Broome
                                 John W. Baumann
                                 Laurenne M. Babayan
                                 Nicolas G. Keller (Admitted *Pro Hac Vice*)

                                 *Attorneys for Defendant*

-1-

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Plaintiffs Timothy Millar and Marco Martinez bring claims against defendant Express Technologies Ltd. ("ExpressVPN") under California's Automatic Renewal Law ("ARL"), Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA") based on claims that they did not know they would be charged on a recurring basis for virtual private network ("VPN") services. Plaintiffs' claims cannot be reconciled with ExpressVPN's clear and conspicuous disclosures—including "billed every month" and "billed every 12 months," which convey recurrence—or the fact that a VPN is, by its nature, a service consumers generally use on an ongoing basis. Merits aside, however, their claims do not belong in this Court for several reasons.

***First,*** the Court lacks personal jurisdiction over ExpressVPN, a foreign company that is not at home in the State of California. Plaintiffs have not—and cannot—establish that their claims arise out of ExpressVPN's forum-related activities during the relevant time period, which were (at most) very limited in nature. Instead, plaintiffs voluntarily subscribed to ExpressVPN's globally available online service, and their personal jurisdiction theory rests entirely on their own California residency and advertisements that did not target California. Under Ninth Circuit precedent, these allegations do not give rise to personal jurisdiction.

***Second,*** the Court lacks subject matter jurisdiction over this dispute because plaintiffs fail to allege injury in fact and thus lack standing. Nowhere do plaintiffs claim that they were deprived of the VPN services they paid for, that they did not obtain the full benefit of their bargain, or that they otherwise suffered a cognizable injury. Instead, they vaguely point to the ARL's "unconditional gift" provision as the supposed statutory basis for such an injury. However, to the extent this "unconditional gift" provision of the ARL gives rise to an injury at all, it applies only to tangible goods—not intangible digital services like VPN subscriptions—and is therefore inapplicable.

-2-

**Third,** the Court lacks equitable jurisdiction because plaintiffs have an adequate remedy at law through their CLRA claim. Plaintiffs frame their equitable claims under the FAL and UCL as fundamentally distinct from their legal claims under the CLRA, but the reality is that all of plaintiffs' claims seek the exact same money damages. Plaintiffs cannot repackage their claims to plead around this reality.

**Fourth,** even if the Court were to find it has personal and subject matter jurisdiction, plaintiff Millar agreed to resolve his claims in arbitration, including any threshold disputes as to arbitrability. Accordingly, to the extent the Court exercises jurisdiction as to Millar, it should do so only to compel his claims to arbitration.

**Finally,** plaintiffs fail to state valid claims under the FAL, UCL, and CLRA for a variety of reasons, as shown below. Foremost among those reasons is that plaintiffs' own pleadings and exhibits demonstrate that the autorenewing nature of these services was repeatedly, explicitly, and visibly disclosed.

## **BACKGROUND**

### A.    ExpressVPN Provides VPN and Privacy Services

ExpressVPN is a British Virgin Islands ("BVI") company and an established provider of online privacy and security solutions, including through its flagship VPN subscription service. *See* Declaration of Jack Buckley ¶¶ 3-5 (hereinafter, "Buckley Decl."). A VPN uses software to encrypt users' internet connections and provide a secure tunnel between users' devices and the internet. *Id.* ¶ 5. Often used by employers and organizations to enable remote employees to securely access institutional networks from across the globe, VPNs are also available to individuals for their everyday internet browsing. *Id.* ¶ 8. ExpressVPN's VPN service is available entirely online and without the need for any hardware or other tangible product. *Id.* ¶ 9. ExpressVPN is dedicated to privacy and digital security, having launched initiatives like the ExpressVPN Rights Center. *Id.* at ¶ 7. ExpressVPN's VPN service is also routinely audited for compliance with strict security and privacy standards. *Id.* ¶ 6.

**B.** **Plaintiffs Purchased Subscriptions After Receiving Notice That The Subscriptions Would Automatically Renew**

1. Millar's Monthly Subscription

On September 10, 2022, Millar signed up for a monthly subscription to the ExpressVPN service and paid the monthly fee of $12.95 for his first month. First Amended Complaint ("FAC") ¶ 53. In doing so, Millar clicked through the ExpressVPN sign-up and checkout page, which was split into "3 easy steps." *Id*. ¶ 40 & Ex. 5. At "Step 1," the page invited visitors to "Select a plan that works for you" from three different subscription "VPN plans": (i) "1 Month . . . $12.95 per month . . . Billed *every* month;" (ii) "12 Months + 3 Months FREE . . . $6.67 per month . . . Billed once for 15 months (including 3 free months), then *every* 12 months;" and (iii) "6 Months . . . $9.99 per month . . . Billed *every* 6 months." *Id*. ¶¶ 40 & Ex. 5 (emphases added). At "Step 2," a user would enter their email address. *Id*. ¶ 43 & Ex. 5. And at "Step 3," entitled "Select your preferred method of payment," the subscription nature of the VPN service was described once again right above the "Join Now" button, with language specific to the plan chosen by the user at Step 1. *Id*. For example, the notice for the month-to-month plan Millar chose stated, in black font against the white background, "ExpressVPN 1-month plan, billed monthly ($12.95/month)." *Id*. On the same date as his order, Millar received a confirmation email that stated, in relevant part, "Price 12.95 USD *billed monthly*." *Id*., Ex. 7 (emphasis added). Consistent with these disclosures, on October 10, 2022, Millar was charged the renewal fee of $12.95 for his second month of service. *Id*. ¶ 54. On October 22, 2022, Millar allegedly "cancelled the service so he would not be charged again." *Id*.

2. Martinez's Yearly Subscription

On June 6, 2023, Martinez signed up for a yearly subscription to the ExpressVPN service and paid the yearly fee of $99.95 for his first year. *Id*. ¶ 56. In doing so, Martinez also clicked through the ExpressVPN sign-up and checkout page,

-4-

which was largely the same as when Millar signed up—but with the following adjustments to account for the different autorenewal cadence: At "Step 1," the yearly subscription was described as, "12 Months . . . $8.32 per month;" and, at "Step 3," the applicable notice right above the "Join Now" button stated, according to the FAC, "ExpressVPN 12-month plan, billed $99.95 ($8.32/month average) for the first year, **then $116.95 yearly**." *Id.*, Ex. 6 (emphasis added).  Consistent with this disclosure, on June 6, 2024, Martinez was charged $116.95 for his second year of the ExpressVPN service—yet he now claims this was a "surprise[]" and that he cancelled his "credit card so ExpressVPN could not charge him again, without his consent." *Id.* ¶ 57.

### 3.    ExpressVPN Provided Repeated Autorenewal Notices

Millar and Martinez both completed all three of the above-described steps—and thus, at minimum, saw the numerous disclosures that their selected subscription would renew—and then chose to click the "Join Now" button.  *Id.*, Exs. 5 & 6. Despite these notices—and without alleging they had difficulty cancelling their subscriptions or that they sought refunds or any customer service support—plaintiffs assert that somehow the recurring nature of the VPN subscription was "[u]nbeknownst to" them.  *Id.* ¶¶ 4-5.

Plaintiffs argue ExpressVPN's stylistic choices of font colors and sizes are to blame, *id.* ¶¶ 42, 44-45, but their characterizations are based on degraded website excerpts pasted into the FAC that are contradicted by the actual webpages viewed in normal resolution.  *Compare id.*, *with* FAC, Exs. 5 & 7, *and* Buckley Decl., Ex. 1 (Sept. 10, 2022).[1]  For instance, the font of the text "per month," "Billed every month," "Billed once for 15 months (including 3 free months), then every 12 months,"

---

[1]    *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015) ("When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(2), a court may consider extrinsic evidence—that is, materials outside of the pleadings, including affidavits submitted by the parties.").

"Billed every 6 months," "ExpressVPN 1-month plan, billed monthly ($12.95/month)," and "ExpressVPN 12-month plan, billed $99.95 ($8.32/month average) for the first year, then $116.95 yearly" was no smaller than other important notices on the webpage, including "30-day money-back guarantee," "All amounts shown are in USD," and "Privacy guarantee: We do not share your information and will contact you only as needed to provide our service," *id.*, Exs. 5 & 6—none of which plaintiffs complain or assert were obscured, even though they were the same size.

Plaintiffs similarly complain that certain autorenewal disclosure text was in "grey text that fades into the background," *id.* ¶ 42, but this ignores that such "grey text" was used abundantly throughout the page. *See id.*, Exs. 5 & 6. This includes the grey text used for key data entry fields (*e.g.*, "Your email address," "First Name," "Last Name," "Card Number") and even for emphasizing that one discounted rate was a significant drop from the usual price, which for comparison was in grey and crossed out (*i.e.*, "~~$12.95~~"), *id.*, Exs. 5 & 6; Buckley Decl., Ex. 1, belying the suggestion that ExpressVPN's use of grey text was intended to obscure.

## C.    ExpressVPN's Terms of Service Also Disclosed the Automatic Renewal Terms and, as to Millar, Required Arbitration

At all relevant times, the following notice appeared directly below the "Join Now" button on ExpressVPN's checkout page: "By submitting this form, you agree to our Terms of Service." Buckley Decl., Ex. 1; *see also* FAC, Ex. 5 (Dec. 1, 2022). This sentence appeared in black font against a white background, with ample whitespace setting it apart from all other text. And within the sentence, the words "Terms of Service" ("TOS") were hyperlinked, green in color, and starkly underlined. Buckley Decl., Ex. 1; *see also* FAC, Ex. 5. Those TOS, which were available at www.expressvpn.com/tos and www.express-vpn.com/tos, described both the applicable automatic renewal and dispute resolution terms, which, as to Millar, included an arbitration agreement. Buckley Decl., Ex. 2 § 15 (Sept. 10, 2022).

-6-

### 1.    TOS Automatic Renewal Terms

In September 2022 and June 2023, section 4 of the TOS, titled "Subscriptions," stated that "[w]hen supported by your payment method, plans **renew automatically** by default at the completion of the billing term;" "[b]y default, the **renewal term** is for the same duration as the billing term for the original subscription;" "[t]he **subscription fee** will be charged **automatically** to the payment method you last selected;" "to discontinue **automatic renewal** [customers] may sign in to the Site and turn off auto-renewal or email us at support@expressvpn.com;" and "by default, **auto-renewal is turned on** when [customers] use a payment method that supports auto-renewal (such as a credit card or Paypal [*sic*]), and turned off when [customers] use a payment method that does not support auto-renewal (such as Bitcoin)." *Id*., Ex. 2 § 4 (emphases added).  The TOS further stated that "ExpressVPN reserves the right to amend **subscription fees** or institute new fees at any time upon reasonable advance notice . . . Any changes to the pricing will not affect the Subscriber's current **subscription period** and will become effective upon **subscription renewal**." *Id*. (emphases added).

### 2.    Millar Agreed to Mandatory Binding Arbitration

In September 2022, section 15 of the TOS, titled "Arbitration," contained an arbitration agreement requiring that "[a]ll disputes arising out of or relating to this Agreement or the use of the Site or Services shall be finally settled under the Rules of Arbitration ('Rules') of the International Centre for Dispute Resolution (ICDR) by one arbitrator ('Arbitrator') appointed in accordance with said Rules." *Id*., Ex. 2 § 15.  The ICDR is the global division of the American Arbitration Association ("AAA"), and, as such, the two arbitral forums (collectively known as "AAA-ICDR") share substantially the same rules and procedures.  This includes a jurisdictional provision that delegates arbitrability disputes directly to the arbitrator.  *See* ICDR, *International Dispute Resolution Procedures*, Art. 21(1) (Mar. 1, 2021) ("The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections

-7-

with respect to arbitrability, to the existence, scope, or validity of the arbitration agreement(s), . . . without any need to refer such matters first to a court."); AAA, *Consumer Arbitration Rules*, R-14(a) (Sept. 1, 2014) (similar).

## LEGAL STANDARD

**Personal Jurisdiction.** When no federal statute governs personal jurisdiction, courts apply forum state law. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). California exercises personal jurisdiction coextensive with federal due process standards. *See Pavlovich v. Superior Court*, 29 Cal. 4th 262, 268 (2002) (citing Cal. Civ. Proc. Code § 410.10). A plaintiff bears the burden of demonstrating that his or her allegations would establish a prima facie case for personal jurisdiction. *See Boschetto*, 539 F.3d at 1015.

**Article III Standing.** To establish standing under the U.S. Constitution, a plaintiff must prove an "injury in fact" that is causally linked to the conduct complained of and would be redressed by a decision in plaintiff's favor. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[B]are procedural violation[s], divorced from any concrete harm . . . do[] not suffice for Article III standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The plaintiff bears the burden to prove subject matter jurisdiction exists. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990).

**Arbitration.** The Federal Arbitration Act ("FAA") applies where, as concerns Millar here, the arbitration agreement appears in a contract involving interstate commerce. 9 U.S.C. § 1; *cf.* Compl. ¶¶ 11, 13 & Ex. 1. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). If a claim is subject to arbitration, a court lacks authority to address the merits of that claim. *See Prima Paint Corp. v. Flood & Conklin Mfr. Co.*, 388 U.S. 395, 400 (1967). Under

Section 3 of the FAA, a court must stay the case until the arbitration has concluded. 9 U.S.C. § 3.

**FRCP 12(b)(6).** "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (cleaned up).

<u>**ARGUMENT**</u>

## I.    THE COURT SHOULD DISMISS FOR LACK OF JURISDICTION

The Court should dismiss the FAC in its entirety because the Court lacks personal jurisdiction over ExpressVPN, subject matter jurisdiction over plaintiffs' claims, and equitable jurisdiction over plaintiffs' FAL and UCL claims.

### A.    <u>The Court Lacks Personal Jurisdiction Over ExpressVPN</u>

ExpressVPN is a BVI-formed company that offers its services around the world.  Buckley Decl. ¶¶ 3-4.  It has no offices in the United States.  *Id.* ¶ 3.  To exercise specific personal jurisdiction over a non-resident defendant like ExpressVPN, the Ninth Circuit applies a three-prong minimum contacts test:  "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum . . . ; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (cleaned up).

"The plaintiff bears the burden of satisfying the first two prongs of the test.  If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state.  If the plaintiff succeeds . . . the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id.* (citations omitted).

"[M]ere injury to a forum resident is not a sufficient connection to the forum. . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014); *see Doe v. Call-On Doc*, 2025 WL 1677632, at *5 (S.D. Cal. June 13, 2025) ("A court must look 'to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" (citing *Walden*, post-*Briskin*)).

### 1.    No Purposeful Direction

The *Calder v. Jones*, 465 U.S. 783 (1984) three-part "effects" test governs the assessment of "purposeful direction." *Schwarzenegger*, 374 F.3d at 805. A plaintiff must establish the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, [and] (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* A plaintiff's assertion of having "suffer[ed] an injury in the forum state alone is insufficient to demonstrate purposeful direction." *Moody v. Textron Inc.*, 2025 WL 2025597 at *4 (C.D. Cal. July 2, 2025) (cleaned up). Although plaintiffs point to three different categories of purported jurisdictional "evidence," they have not and cannot make the required *Calder* showings.

***First***, plaintiffs describe Google keyword ads and ExpressVPN's webpages that allegedly appeared on Google Search in response to the search terms "vpn to california," "california vpn," and "express vpn california." FAC. ¶¶ 14, 16, 18. But these Google ads bear no—or at most, incidental—indicia of being "direct[ed] . . . specifically at California . . . to enter contracts with California consumers," as plaintiffs contend. *Id.* ¶ 13. Instead, ExpressVPN's advertising conveys to its global—or at minimum nationwide—audience that it offers access to thousands of VPN servers in hundreds of locations around the globe, with California and its cities merely serving as some of the hundreds of examples advertised.

Plaintiffs' cherry-picked quotes to the words "California," "Los Angeles," and "San Francisco," *see, e.g. id.* ¶¶ 15-16, 20, obfuscate the inherent nature and appeal

-10-

of VPN services as being globally accessible, from anywhere to anywhere, as well as the actual global and nationwide scope of these advertisements when viewed in context: "Premium VPN Service With **3,000+ Servers Worldwide**;" *id.* ¶ 16 (emphasis added), "The best VPN for California is ExpressVPN, with . . . server locations **in 105 countries around the world**;" *id.* ¶ 18 (emphasis added), and "Best VPN **for the U.S.** . . . Ultra-fast servers from **coast to coast** . . . ExpressVPN users can connect to **server locations in 105 countries and counting. You can access any of these VPN server locations from the United States, or anywhere else in the world**," *id.*, Ex 2 (emphases added).  Plaintiffs also assert ExpressVPN "recommended that California consumers choose one of ExpressVPN's California servers"—but what ExpressVPN actually said has nothing to do with California consumers:

> If you need an IP address in New York, New Jersey, Los Angeles, Seattle, Chicago, **or any other specific U.S. location**, use the dropdown menu in the location picker. Choose from "Recommended" locations or select the "All" tab for the full list. **For best results, choose the server location closest to your actual geographic location.** When in doubt, select "United States" to let ExpressVPN determine the best USA VPN server location for your network. . . . ExpressVPN has servers in New York, New Jersey, Los Angeles, Chicago, and many other U.S. cities, **but the best one for your needs depends on many factors**. . . . **ExpressVPN users can connect to server locations in 105 countries and counting. You can access any of these VPN server locations from the United States, or anywhere else in the world.**

*Id.*, Ex. 2 (emphases added).  Put differently, when ExpressVPN states that it is the "Best VPN **for** California," the "#1 VPN Service **for** California," the "Best VPN **for**

-11-

the US," the plain meaning conveyed is that ExpressVPN is the "best" ***for remotely
accessing*** servers in those locations, which—by definition given the very nature of a
VPN service—is disconnected from a user's physical location, which is anywhere in
the world by design. *See id*., Ex. 1.

Thus, at most, plaintiffs allege only that, unremarkably, "California consumers
could sign up for ExpressVPN." *Id*. ¶ 15.  But such "random, isolated, or fortuitous"
contacts created by the actions of the consumers do not create personal jurisdiction
over ExpressVPN, as even "[t]he fact that a site's operators anticipated persons from
a particular forum might access the site is not enough to show they actually desired
those viewers." *Prolacta Bioscience, Inc. v. Prolact Ltd.*, 2025 WL 2078270, at *10
(C.D. Cal. June 18, 2025).  Because ExpressVPN's advertisements were not
"expressly aimed at the forum state," plaintiffs fail the second part of the *Calder* test.

***Second***, plaintiffs allege that "[t]o service the California businesses it solicits,
ExpressVPN controls . . . physical servers located in California (e.g. in Los Angeles
and San Francisco). And for these servers, ExpressVPN's related contracts would be
centered in California (the location of the server)."  FAC ¶ 22.  Although plaintiffs
appear to be referring to the servers that host VPN services ("VPN Servers"), they do
not allege that their claims arise out of ExpressVPN's contracts for VPN Servers, the
location of the VPN Servers, or any issues relating to the VPN Servers, and thereby
fail the third part of the *Calder* test.  Rather, plaintiffs complain about ExpressVPN's
consumer-facing websites, which were hosted by ***separate*** servers (the "Website
Servers"), the location of which was determined not by ExpressVPN but rather "by
the third-party webhosting service provider hired by ExpressVPN to host the websites
such that they are accessible globally."  Buckley Decl. ¶ 19.

***Third***, plaintiffs allege "ExpressVPN entered an affiliate contract with
[YouTube] content creator [Geekman], helped him choose keywords targeting
California, approved the content targeting California, and provided him with an
affiliate link to get paid for referring California consumers to ExpressVPN."  FAC ¶

-12-

28.  However, just like ExpressVPN's own advertisements, Geekman's discussion is about the **VPN Servers**, not the servers that host the consumer-facing statements about which plaintiffs complain.  And, as previously noted, this type of VPN Server messaging is equally if not predominately for the benefit of customers **outside** of California who would like to browse the internet from a California IP address.  And, in all events, "a defendant does not purposefully direct its activities at the forum state when the unilateral activity of the plaintiff **or a third party** is all that connects the defendant to the forum state."  *Los Angeles Turf Club, Inc. v. US Racing*, 2025 WL 2019948, at *3 (C.D. Cal. May 15, 2025) (emphasis added).

In sum, plaintiffs have failed to demonstrate purposeful direction or availment on the part of ExpressVPN—and the Ninth Circuit's recent *en banc* decision in *Briskin v. Shopify* does not dictate a contrary conclusion.  In that case, plaintiff Briskin purchased a product from an online retailer that, unbeknownst to him, used defendant Shopify's payment checkout service.  *Briskin v. Shopify*, 135 F.4th 739, 746 (9th Cir. 2025).  "*[W]hile knowing that [Briskin's] device . . . was located in California*," Shopify affirmatively reached into that device to "surreptitiously implant[] cookies that permanently remained on Briskin's device, tracked its physical location, and collected data regarding Briskin's online shopping activity." *Id.* (emphasis added). Briskin alleged "Shopify used the resulting data to compile a consumer profile that Shopify marketed widely, including to many California merchants." *Id*.  Briskin had not sought out Shopify and had no reason to know or suspect that his decision to interact with the retailer's website would result in Shopify's permanent data mining cookies being installed on his device. *Id.* at 746-49.  Accordingly, the nexus between Shopify's conduct and Briskin's claims was clear—it was **Shopify's** conduct (installing trackers without consent on devices it knows are in California) that gave rise to Briskin's data privacy claims.  Under those highly-specific circumstances, the Ninth Circuit held that specific personal jurisdiction over Shopify existed. *Id.* at 762. In contrast, none of these *Briskin* factors are present here, where plaintiffs simply

-13-

went online to obtain VPN services from a foreign company that provides services globally pursuant to TOS governed by BVI law.

### 2. There Is No Nexus Between Plaintiffs' Claims and ExpressVPN's Alleged Contacts

The second prong of the specific personal jurisdiction test requires that plaintiffs' claims "arise[] out of or relate[] to the defendant's forum-related activities." *Schwarzenegger*, 374 F.3d at 802. This requirement ensures that the forum-related contacts are not only purposeful, but also meaningfully connected to the claims at issue. *Id.* at 803-05. Plaintiffs cannot satisfy this prong, as they allege no facts indicating ExpressVPN's conduct targeted them—or anyone—in California in September 2022 or June 2023. *See Call-On Doc, Inc.*, 2025 WL 1677632, at *7. Rather, it is *plaintiffs* who affirmatively sought out and obtained the ExpressVPN subscription services. *See* FAC ¶¶ 53, 56. But plaintiffs' conduct cannot give rise to personal jurisdiction over ExpressVPN, as only ExpressVPN's own conduct can do so. *See Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum.").

### 3. Exercising Personal Jurisdiction Would Be Unreasonable

Even if plaintiffs could satisfy the first two prongs of the specific personal jurisdiction analysis (they cannot), exercising personal jurisdiction over ExpressVPN would be unreasonable and offend traditional notions of fair play and substantial justice. Courts apply a seven-factor balancing test to assess reasonableness: "(1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Briskin*, 135 F.4th at 761. Because plaintiffs fail to adequately allege ExpressVPN purposefully directed its conduct

-14-

toward California or that their claims arise out of ExpressVPN's alleged California contacts, their ExpressVPN subscriptions are not governed by California law, and because Millar agreed to resolve his claims elsewhere, it would be unreasonable to exercise personal jurisdiction over ExpressVPN.

### B.    The Court Lacks Subject Matter Jurisdiction

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," without which a court lacks subject matter jurisdiction. *Lujan*, 504 U.S. at 560.   In addition to the injury-in-fact requirement under Article III of the U.S. Constitution, the laws plaintiffs invoke (FAL, UCL, and CLRA) also impose their own statutory standing requirements.  Cal. Bus. & Prof. Code § 17204 (UCL) (requiring "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."); *id.* § 17535 (FAL) (same standard for false advertising claims); Civil Code § 1780(a) (CLRA) (only a "consumer who suffers any damage . . . may bring an action").

The Court lacks subject matter jurisdiction over this dispute because plaintiffs fail to allege injury in fact or that they "lost money or property" within the statutory meaning.  *See Roz v. Nestle Waters N. Am., Inc*., 2017 WL 132853, at *6 (C.D. Cal. Jan. 11, 2017)  ("To proceed with their UCL and FAL claims, . . . 1) the Plaintiffs must have suffered an injury-in-fact; and 2) the Plaintiffs must have lost money or property as a result of unfair competition.").  Plaintiffs' theory of standing rests on the premise that they were charged for an auto-renewed period of ExpressVPN's services without consent, in violation of the ARL.  FAC ¶¶ 52, 53, 56.  But plaintiffs do not suggest that ExpressVPN failed to provide the services for which they paid. *See id.* ¶ 35.  They do not allege that the services they received were deficient or that they were worth less than the amount paid.  Nor do plaintiffs allege that they attempted to use the service but were denied access, or that they did not use the service during the auto-renewed period.  In short, plaintiffs received precisely what they paid for and thus obtained the benefit of their bargain.  *See Roz*, 2017 WL 132853, at *7 ("[P]aying

-15-

money for a product, while technically a 'loss' of that money, does not necessarily qualify as an injury.  The money has changed hands, but the payer has received something of equal or greater value.  Therefore, not all payments are injuries, and not all induced payments satisfy the 'lost money or property' prong of the UCL and FAL.").  That plaintiffs later decided they would not have made the purchase had they read the disclosures they were shown does not transform a completed and undisputed exchange of value into a cognizable injury in fact or economic loss under California law.  *See generally Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1094 (C.D. Cal. 2015) ("[B]eing induced to purchase a product one would not otherwise have purchased is not loss of money or property within the meaning of the statute as long as one still receives the benefit of the bargain.").

Plaintiffs' attempt to invoke the ARL's "unconditional gift" provision to cure this defect is unavailing.  *See* FAC ¶ 39.  The relevant provision states that, "[A]ny **goods, wares, merchandise, or products** [sent] to a consumer, under a[n] . . . automatic renewal of a purchase, without first obtaining the consumer's affirmative consent . . . shall for all purposes be deemed an unconditional gift to the consumer, who may use or dispose of the same . . . without any obligation whatsoever."  Cal. Bus. & Prof. Code § 17603 (emphasis added).  However, this provision does not itself confer the constitutional or statutory injury required for standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("Article III standing requires a concrete injury even in the context of a statutory violation."); *Zeller v. Optavia, LLC*, 2022 WL 17858032, at *9 (S.D. Cal. Dec. 22, 2022) ("[T]he ARL's unconditional gift provision does not independently confer standing."); *Mayron v. Google LLC*, 54 Cal. App. 5th 566, 576 (Ct. App. 6th Dist. 2020) ("[T]he unconditional gift provision . . . does not confer standing.").

Furthermore, even assuming *arguendo* that the "unconditional gift" provision in the ARL could confer standing under certain circumstances, it applies only where a defendant delivers **tangible goods** to a consumer in violation of the statute.  *See*

-16-

*McKee v. Audible, Inc.*, 2018 WL 11263238, at *18, n. 15 (C.D. Cal. Mar. 12, 2018)

("*Roz* involved shipments of water and thus, unlike the present case[,] resolved the

standing issue based on the unconditional gifts provision in § 17603,[2] which might

not apply to [Audible Credits]"); *see also Johnson v. Pluralsight, LLC*, 236 F. Supp.

3d 1176, 1183 (E.D. Cal. 2017) (§ 17603 "applies only to tangible products that are

shipped to a consumer, and not to intangible services."), *aff'd in part, rev'd in part on

other grounds*, 728 F. App'x 674 (9th Cir. 2018).  Because plaintiffs here purchased

a subscription for online **services** from ExpressVPN, the "unconditional gift"

provision does not apply.  *See Mayron v. Google, Inc.*, 2016 WL 1059373, at *3 (Cal.

Super. Feb. 26, 2016) (whereas "a consumer could keep a good or product that is sent

in violation of the [ARL], . . . there is nothing to keep when it is only a service that is

provided."), *aff'd*, 54 Cal. App. 5th 566.  Therefore, the "unconditional gift" provision

is both inapplicable and, in any event, incapable of conferring standing.

## C.    The Court Also Lacks Equitable Jurisdiction

"[T]o entertain a request for equitable relief, a district court must have equitable

jurisdiction, which can only exist under federal common law if the plaintiff has no

adequate legal remedy." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir.

2022); *see also Regueiro v. FCA US, LLC*, 671 F. Supp. 3d 1085, 1099 (C.D. Cal.

2023).  Accordingly, equitable restitution is unavailable when a plaintiff seeks the

same monetary relief through equity that is available through a legal damages claim,

particularly where that relief would constitute "the same amount of money for the

exact same harm" measured by the same metric, such as "a full refund of the purchase

price." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

That is exactly what plaintiffs seek here.  Plaintiffs are pursuing a CLRA

damages claim seeking "a full refund," which is precisely equivalent to the monetary

---

[2]  *Roz's* holding on this point should also be disregarded because it was decided pre-
*TransUnion*.

amount they seek via restitution. *Id.*; *see Smart v. Nat'l Collegiate Athletic Ass'n*, 2023 WL 4827366, at *10–11 (E.D. Cal. July 27, 2023) (a plaintiff "cannot seek restitution under the UCL for the same money he would receive for his claims at law"). Therefore, at a minimum, the Court should dismiss plaintiffs' equitable claims under the FAL and UCL.[3]

## II.    IN THE ALTERNATIVE, THE COURT SHOULD COMPEL ARBITRATION AS TO MILLAR

If the Court concludes it has jurisdiction over this matter, it should compel arbitration as to Millar. *See Geographic Expeditions, Inc. v. Est. of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1106 (9th Cir. 2010) ("[A] federal court has jurisdiction over a petition to compel arbitration if the federal court would have jurisdiction over the underlying substantive dispute.").

### A.    <u>Millar Agreed to Arbitrate His Claims</u>

When Millar subscribed to ExpressVPN's service, ExpressVPN provided clear, conspicuous notice that doing so required him to agree to ExpressVPN's TOS, and Millar affirmatively clicked the action button signifying his assent to the agreement, including its arbitration provision. *See* Buckley Decl. ¶ 12. "Federal courts . . . have recognized the general enforceability of . . . online agreements that require affirmative user assent." *In re Holl*, 925 F.3d 1076, 1085 (9th Cir. 2019) (citations omitted). Indeed, courts in the Ninth Circuit consistently find assent under materially identical circumstances. *See, e.g., Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862, 864 (9th Cir. 2017) ("The notices on Amazon's checkout and account registration pages, which alerted Wiseley that clicking the corresponding action button constituted agreement to the hyperlinked [Conditions of Use], were in sufficient proximity to give him a

---

[3]  Contrary to plaintiffs' implication, *see* FAC ¶ 65, even in California state court, the rule that a plaintiff may only seek equitable relief if they lack an adequate legal remedy "is one of the most firmly established principles in equitable jurisprudence." *Wilkison v. Wiederkehr*, 101 Cal. App. 4th 822, 835 (2002).

-18-

'reasonable opportunity to understand' that he would be bound by additional terms.");
*Surkhabi v. Tesla, Inc.*, 2022 WL 19569540, at *3 (C.D. Cal. Oct. 27, 2022)
("[Plaintiff] admits before clicking the 'Place Order' button, there is an option to click an underlined hyperlink labeled 'Model X Order Agreement.' . . . Tesla cannot be faulted for [plaintiff's] failure to read the document containing the arbitration clause when it was readily available.").

Because there can be no dispute Millar agreed to arbitrate his claims against ExpressVPN, they must be sent to arbitration, and this action should be stayed as to Millar pending completion of any arbitration.  *See* 9 U.S.C. § 3; *Prima Paint Corp*, 388 U.S. at 400 (courts lack authority to address the merits of claims subject to arbitration); *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").  Further, as shown below, Millar agreed to delegate arbitrability questions to the arbitrator. Accordingly, the FAA limits the Court's role to determining whether a valid arbitration agreement exists between the parties.  *See Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  If the answer is "yes"— and it is—the Court may go no further and must compel arbitration.  *Id.*

### B.    <u>The Arbitration Agreement Delegates Arbitrability Disputes</u>

Millar's arbitration agreement provides that "[a]ll disputes arising out of or relating to this Agreement or the use of the Site or Services shall be finally settled under the Rules of Arbitration ('Rules') of the International Centre for Dispute Resolution (ICDR) by one arbitrator ('Arbitrator') appointed in accordance with said Rules."  Buckley Decl., Ex. 2 § 15.  These ICDR Rules empower the arbitrator to decide all threshold issues, including disputes related to the scope or validity of the arbitration agreement itself.  Specifically, Article 21 of the ICDR Rules provides that, "[t]he arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to arbitrability, to the existence, scope, or validity of the

-19-

arbitration agreement(s) . . . without any need to refer such matters first to a court." ICDR, *International Dispute Resolution Procedures*, Art. 21(1).

"Under federal law, the incorporation of a particular set of arbitration rules—such as the ICDR rules—that provide for the arbitrator to decide questions of arbitrability 'constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability.'" *ASUS Computer Int'l v. InterDigital, Inc*, 2015 WL 5186462, at *3 (N.D. Cal. Sept. 4, 2015) (citation omitted); *see also Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 480–81 (9th Cir. 2024) ("Courts have found that parties clearly delegated arbitrability where they incorporated an arbitrator's arbitration rules in the agreement.").   So, too, here.

## III.   IN ANY EVENT, THE FAC SHOULD ALSO BE DISMISSED FOR FAILURE TO STATE A CLAIM

If the Court concludes it has jurisdiction over this matter, and declines to compel arbitration as to Millar, it should nevertheless dismiss plaintiffs' FAC for failure to state a claim.

### A.   <u>Plaintiffs' Claims Sounding in Fraud Fail the "Reasonable Consumer" Test and the "Particularity" Requirement of FRCP 9(b)</u>

"Courts use a 'reasonable consumer' standard to determine whether a party has violated the UCL, FAL, or CLRA.  This standard considers whether 'members of the public are likely to be deceived' by the alleged advertising or business practices." *Rutter v. Apple Inc.*, 2022 WL 1443336, at *8 (N.D. Cal. May 6, 2022) (citation omitted).

Here, any reasonable consumer would have understood that ExpressVPN's subscriptions were automatically-renewing.  As shown above, ExpressVPN provided ***repeated, explicit, and visible*** disclosures to plaintiffs at multiple steps in their checkout process regarding the automatic renewal of their subscriptions.   This is evident from plaintiffs' own pleading and exhibits, making Rule 12(b)(6) dismissal appropriate.  *See generally Walkingeagle v. Google, LLC*, 2024 WL 4379734, at *1

-20-

(9th Cir. Oct. 3, 2024) ("[A] question of fact can be resolved on a motion to dismiss when clear and conspicuous disclosures are evident in the pleadings, such that no reasonable jury could find otherwise" under the ARL.).  In sum, plaintiffs' claims under the FAL, CLRA, and "deceptive" prong of the UCL—all of which, by definition, sound in fraud—must be dismissed.  *See Eidmann v. Walgreen Co*., 522 F. Supp. 3d 634, 643 (N.D. Cal. 2021) ("Conduct that is considered deceptive or misleading runs afoul of the FAL, CLRA, and fraudulent prong of the UCL when it is 'likely to deceive' a 'reasonable consumer.'"); *Zeller v. Optavia LLC*, 2024 WL 1207461, at *5 (S.D. Cal. Mar. 14, 2024) (in the context of a CLRA claim predicated on ARL violations, "a fact is 'material' if a reasonable consumer would deem it important in determining how to act in the transaction at issue").

Additionally, "[p]laintiffs' fraud and California consumer protection claims (which sound in fraud) must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b)."  *Id.* at *4 (cleaned up).  Specifically, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.  A plaintiff must set forth more than the neutral facts necessary to identify the transaction. . . .  For claims involving omissions, 'plaintiff must . . . provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information."  *Tan v. Quick Box, LLC*, 2020 WL 7226440, at *25 (S.D. Cal. Dec. 8, 2020) (cleaned up).  But, again, plaintiffs do not and cannot make such a showing, as their own allegations admit that ExpressVPN **did** repeatedly, explicitly, and visibly disclose the fact that the subscriptions autorenewed.  *See* Background § B.3., *supra*; FAC, Exs. 5 & 6.

### B.    Plaintiff's Remaining UCL Claims Also Fail

Plaintiffs also assert claims under the "Unlawful" and "Unfair" prongs of the UCL, but these theories fail as well—plaintiffs merely repackage the same underlying conduct, sounding in fraud, for which plaintiffs sued under the "Deceptive" prong.

"Because [plaintiffs] failed to allege violations of the FAL, CLRA, and UCL pursuant to Rule 9(b), [they are] precluded from utilizing these violations as predicate acts under the unlawful prong of the UCL.  Likewise, [plaintiffs'] claim under the unfair prong of the UCL fails . . . . [W]hen [plaintiffs'] claim under the unfair prong overlaps entirely with the conduct alleged in the fraudulent and unlawful prongs of the UCL, 'the unfair prong of the UCL cannot survive if the claims under the other two prongs . . . do not survive.'" *Eidmann*, 522 F. Supp. 3d at 647.  So, too, here.

*[Remainder of page intentionally left blank]*

-22-

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss this action for lack of jurisdiction or, if it determines it has jurisdiction, compel plaintiff Millar's claims to arbitration and dismiss all remaining claims for failure to state a claim for which relief can be granted.

DATED:  October 10, 2025          QUINN EMANUEL URQUHART &
                                  SULLIVAN, LLP


                                  By   /s/ Stephen A. Broome
                                      Stephen A. Broome (Cal. Bar No. 314605)
                                      stephenbroome@quinnemanuel.com
                                      John W. Baumann (Cal. Bar No. 288881)
                                      jackbaumann@quinnemanuel.com
                                      Laurenne M. Babayan (Cal. Bar No. 348075)
                                      laurennebabayan@quinnemanuel.com
                                      865 South Figueroa Street, 10th Floor
                                      Los Angeles, California 90017-2543
                                      Telephone:  (213) 443-3000
                                      Facsimile:   (213) 443-3100

                                      Nicolas G. Keller (N.Y. Bar No. 5549522)*
                                      nicolaskeller@quinnemanuel.com
                                      295 5th Avenue, 9th Floor
                                      New York, New York 10016
                                      Tel:  (212) 849-7000
                                      Fax:  (212) 849-7100
                                      (*Admitted *Pro Hac Vice*)

                                      *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for defendant Express Technologies Ltd., certifies that this brief contains 6,922 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 10, 2025

<u>/s/ Stephen A. Broome</u>
Stephen A. Broome

-24-