Stephen A. Broome (Cal. Bar No. 314605)
stephenbroome@quinnemanuel.com
John W. Baumann (Cal. Bar No. 288881)
jackbaumann@quinnemanuel.com
Rex N. Alley (Cal. Bar No. 346525)
rexalley@quinnemanuel.com
QUINN EMANUEL
 URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Attorneys for Defendant*

*[Continued on next page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TIMOTHY MILLAR and MARCO MARTINEZ, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>EXPRESS TECHNOLOGIES, LTD.,<br><br>Defendant. | Case No.: 8:25-cv-01273-FWS-DFM<br><br>**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE FAC AND, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**<br><br>Hearing Date:   December 5, 2025<br>Time:              10:00 AM<br>Action Filed:    June 13, 2025<br>Judge: Hon.     Fred W. Slaughter<br>Trial Date:       None Set |

Nicolas G. Keller (N.Y. Bar No. 5549522)*
nicolaskeller@quinnemanuel.com
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel:  (212) 849-7000
Fax:  (212) 849-7100
(*Admitted *Pro Hac Vice*)

*Attorneys for Defendant*

# **TABLE OF CONTENTS**

**Page**

I.    PLAINTIFFS FAIL TO PROVE PERSONAL JURISDICTION ....................2

    A.    Plaintiffs Fail to Establish "Purposeful Direction" ................................2

        1.    ExpressVPN's Advertisements .....................................2

        2.    ExpressVPN's California VPN Servers........................................7

        3.    ExpressVPN's Third-Party Affiliate Marketing .........................8

II.   PLAINTIFFS FAIL TO ESTABLISH STATUTORY STANDING ...............9

III.  PLAINTIFFS FAIL TO ESTABLISH EQUITABLE JURISDICTION ........11

IV.   MILLAR REMAINS BOUND TO ARBITRATE ........................................12

    A.    Millar Demonstrably Consented to Arbitration ...................................12

    B.    Millar Further Agreed to Delegate Arbitrability Disputes ..................16

V.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE THEIR CLAIMS ........18

    A.    Plaintiffs' Fraud Claims Fail the Reasonable Consumer Test..............18

    B.    Plaintiffs Fail to State a Violation of the ARL ....................................19

    C.    Plaintiffs' Other Claims Merely Repackage Their Fraud Claims.........20

CONCLUSION ..................................................................21

## TABLE OF AUTHORITIES

**Page**

### Cases

*Acosta v. Brave Quest Corp.*,
    733 F. Supp. 3d 920 (C.D. Cal. 2024) ................................................16

*ASUS Computer Int'l v. InterDigital, Inc*,
    2015 WL 5186462 (N.D. Cal. Sept. 4, 2015) ............................16, 17

*Ayla, LLC v. Alya Skin Pty. Ltd.*
    11 F.4th 972 (9th Cir. 2021)..................................................................5

*Briskin v. Shopify, Inc.*
    135 F.4th 739 (9th Cir. 2025)............................................................3, 4

*Bruton v. Gerber Products Co.*,
    703 F. App'x 468 (9th Cir. 2017)........................................................20

*Chabolla v. ClassPass Inc.*,
    129 F.4th 1147 (9th Cir. 2025).......................................................13, 14

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995).................................................................18

*Gagnon v. Ridge Instrument Co.*,
    2008 WL 11422488 (C.D. Cal. Feb. 29, 2008)..................................5, 6

*Gountoumas v. Giaran, Inc.*,
    2018 WL 6930761 (C.D. Cal. Nov. 21, 2018)....................................17

*Guzman v. Polaris Indus.*,
    49 F.4th 1308 (9th Cir. 2022)..............................................................12

*Key v. Qualcomm Inc.*,
    129 F.4th 1129 (9th Cir. 2025)............................................................12

*Kwikset Corp. v. Superior Court*,
    246 P.3d 877 (Cal. 2011) ......................................................................9

*L.A. Turf Club, Inc. v. US Racing*,
    2025 WL 2019948 (C.D. Cal. May 15, 2025) ......................................8

Defendant's Reply in Support of its Motion to Dismiss the FAC and, in the Alternative, to Compel Arbitration

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
 647 F.3d 1218 (9th Cir. 2011)........................................................8, 9

*Mayron v. Google LLC*,
 269 Cal. Rptr. 3d 86 (Ct. App. 2020) ...............................................9

*Morrill v. Scott Fin. Corp.*,
 873 F.3d 1136 (9th Cir. 2017).............................................................2

*Nacarino v. Chobani, LLC*,
 2021 WL 3487117 (N.D. Cal. Aug. 9, 2021) ...................................12

*Rendon v. T-Mobile USA, Inc.*,
 747 F. Supp. 3d 1314 (C.D. Cal. 2024) ...........................................16

*Rent-A-Ctr., W., Inc. v. Jackson*,
 561 U.S. 63 (2010)..............................................................................17

*Roffman v. Rebbl, Inc.*,
 2024 WL 4996063 (N.D. Cal. Dec. 4, 2024).....................................12

*Roz v. Nestle Waters N. Am., Inc.*,
 2017 WL 132853 (C.D. Cal. Jan. 11, 2017) .....................................10

*Rutter v. Apple Inc.*,
 2022 WL 1443336 (N.D. Cal. May 6, 2022) .....................................18

*Schwarzenegger v. Fred Martin Motor Co.*,
 374 F.3d 797 (9th Cir. 2004)..............................................................5

*Smart v. Nat'l Collegiate Athletic Ass'n*,
 2023 WL 4827366 (E.D. Cal. July 27, 2023) ...................................11

*So v. Hyatt Corp.*,
 2025 WL 2994995 (C.D. Cal. Aug. 25, 2025)...........................13, 16

*Sonner v. Premier Nutrition Corp.*,
 971 F.3d 834 (9th Cir. 2020)............................................................11

## Statutes

Cal. Bus. & Prof. Code § 17601(3) ......................................................19

Cal. Bus. & Prof. Code § 17601(a)(2)(C)............................................19

Cal. Bus. & Prof. Code § 17602(a)(3)..................................................20

## **Other Authorities**

AAA, *Consumer Arbitration Rule R-1*,
www.adr.org/media/yawntdvs/2025_
consumer_arbitration_rules.pdf..........................................................................17

AAA, *Consumer Mediation Fee Schedule*,
www.adr.org/media/3uofn4lu/ ...........................................................................17

Geekman, *Best California VPN Server – Get a California IP*, YouTube
(Sept. 28, 2021), www.youtube.com/watch?v=lFYdhYjo7QQ .........................9

ICDR, *About ICDR*, www.icdr.org/about_icdr.....................................................17

-iv-

Case No. 8:25-cv-01273-FWS-DFM
Defendant's Reply in Support of its Motion to Dismiss the FAC and, in the Alternative, to Compel Arbitration

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES

Express Technologies Ltd.'s ("ExpressVPN") Motion to Dismiss ("MTD") demonstrated several independent defects in plaintiffs' First Amended Complaint ("FAC") warranting dismissal.  Plaintiffs' Opposition fails to overcome those numerous and fundamental deficiencies and therefore only confirms the MTD should be granted in its entirety.

The Opposition's arguments regarding personal jurisdiction fall flat because plaintiffs cannot show, as required by *Calder*, that ExpressVPN's global advertising, maintenance of VPN Servers around the world (including in California), or third-party affiliate marketing constitutes the "purposeful direction" of wrongful conduct at California.  Plaintiffs' claim rest instead upon a static checkout page available to users worldwide, not any conduct targeted at California.

Plaintiffs also lack statutory standing for their UCL, FAL, and CLRA claims because there is no dispute they received the full value of the service they paid for, and their arguments about (at most) alleged technical defects in ExpressVPN's autorenewal disclosures fail to establish a cognizable "loss of money or property," especially considering that the checkout page they reference in the FAC contains repeated and conspicuous disclosures that the service would autorenew.

Plaintiffs' also fail to establish equitable jurisdiction, acknowledging they seek restitution for the exact same damages available through their legal remedies.

Finally, even if plaintiffs could satisfy all jurisdictional requirements and state a claim upon which relief may be granted—which they cannot—any claims by Millar must be decided in arbitration.  Millar cannot escape the unambiguous arbitration agreement he consented to:  He was presented with clear and conspicuous notice of ExpressVPN's Terms of Service ("TOS") immediately adjacent to the "Join Now" button, which he clicked, demonstrating his assent.  The TOS, which incorporate the ICDR rules, delegate the question of arbitrability itself to the arbitrator, and plaintiffs'

subsequent arguments about the agreement's validity are misplaced, particularly their fee arguments which ignore the mandatory, consumer-friendly AAA rules that apply.

For all these reasons and those set forth in the MTD, the FAC must be dismissed, or, in the alternative, Millar's claims must be compelled to arbitration.

# I.    PLAINTIFFS FAIL TO PROVE PERSONAL JURISDICTION

## A.    Plaintiffs Fail to Establish "Purposeful Direction"

Plaintiffs acknowledge that they must satisfy the *Calder* effects test by demonstrating ExpressVPN "purposefully direct[ed]" relevant conduct at California. Opp. 1-2.  None of plaintiffs' so-called "three buckets of intentional acts" satisfy this standard.

### 1.    ExpressVPN's Advertisements

ExpressVPN demonstrated that, considered in context, the ads at issue conveyed that consumers located anywhere in the world ***outside*** California could remotely access ExpressVPN Servers located ***inside*** California, just as they can remotely access numerous other servers located around the world.  Indeed, that is a critical feature of VPN services—enabling users to maintain privacy and appear to be located somewhere they are not.  MTD at 10-11.  ExpressVPN's marketing of California IP addresses to its global customer base does not constitute "purposeful direction" toward the California market.

Taken together, plaintiffs' contentions set out that ExpressVPN's audience, by virtue of being global, also includes consumers located in California—who are equally free to select VPN Servers located in California (or another location).  That may be, but any such contacts were at best "incidental" to ExpressVPN's efforts to serve a national and global market and therefore cannot give rise to personal jurisdiction.  *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1147 (9th Cir. 2017). For example, whereas plaintiffs assert ExpressVPN "recommend[ed] that California customers use . . . servers" located in California, Opp. at 3 (citing FAC ¶ 15), the ad itself says no such thing.  It says only that, "For best results, choose the server closest

to your  actual geographic location." MTD at 11. This language provides no recommendations specific to California consumers; nor does it even recommend the use of California VPN servers specifically. It recommends that any ExpressVPN users select the server closest to their location, wherever they are. For California residents, that would sometimes be a server located in California, but not necessarily and not always. [1]

Plaintiffs also point out that the advertisements contain language like "Best VPN for California," "#1 VPN Service for California," and "Fast Servers in Los Angeles" and "San Francisco." Opp. at 3. But, as the MTD shows, this ad conveys that ExpressVPN is the best service "*for remotely accessing* servers in those locations," regardless of the user's physical location. MTD at 11-12. The point conveyed in ExpressVPN's ads is that users may access a California-based VPN (like they may access VPN Servers based in dozens of other locations) from "anywhere . . . in the world." *Id.* (emphasis omitted). Plaintiffs put their own spin on short, selective excerpts taken from the advertisements, arguing, for instance, that ExpressVPN's statement that it is the "#1 VPN Service for California" means that ExpressVPN is the best service "for use by Californians," Opp. at 3—but that is not what the ads say, and plaintiffs cannot reconcile their reading with the ad's focus on the national and global nature of ExpressVPN's offerings.

In a conclusory fashion, plaintiffs argue that, "if a company chooses to advertise in a forum, that is express aiming." Opp. at 2. But the authorities they cite in support are inapposite. First, as already discussed, *see* MTD at 13, *Briskin v. Shopify, Inc.* involved a defendant intentionally and "affirmatively reach[ing]" into a device after it had learned—and therefore already knew—that the device was located

---

[1]  Plaintiffs assert that "several" other "similar ExpressVPN ads target[] California," Opp. at p. 3 (citing FAC ¶¶ 16-18), but they do not even attempt to explain how any such advertisements would enable them to overcome the fatal defects in their arguments.

in California and implanting tracking software into that device.  135 F.4th 739 (9th Cir. 2025) (en banc).  ExpressVPN's passive, globally accessible advertising, which (as shown above) lacks any non-incidental focus on California, is not remotely comparable.    Indeed, *Briskin* expressly upheld the Ninth Circuit's rule that "something more" than this sort of passive Internet advertising is required to establish personal jurisdiction.  *Briskin*, 135 F.4th at 758 n.16.[2]

Plaintiffs' reliance on *Hidalgo v. JPMorgan Chase Bank*, N.A., 2025 WL 1370488 (S.D. Cal. May 12, 2025), is likewise misplaced.  Plaintiffs cite *Hidalgo* for the proposition that, "under *Briskin*, 'intentional conduct affecting a known California resident suffices.'"  Opp. at 2 (quoting *Hidalgo*, 2025 WL 1370488, at *4).  But the word "known" is more significant here than plaintiffs acknowledge.  *Hidalgo* involved a bank reporting inaccurate credit information about the plaintiff "***after*** receiving his disputes, which explicitly notified [the bank] of his location," meaning the bank was "aware[]" of the plaintiff's California residency and thus "knew or should have known that its inaccurate reporting would damage [p]laintiff's credit in California."  *Hidalgo*, 2025 WL 1370488, at *3, 5 (emphasis added).  Plaintiffs allege no actions taken by ExpressVPN based on, or even with knowledge of, any user's California residency.

---

[2]  *Rio Properties, Inc. v. Rio International Interlink*, is also inapposite, as the plaintiff there "alleged that [the defendant] 'specifically targeted consumers' in Nevada 'by running radio and print advertisements in Las Vegas." 284 F.3d 1007, 1020–21 (9th Cir. 2002). These ads were physically introduced and delivered into the forum, as opposed to merely being globally available online. And in *Brayton Purcell LLP v. Recordon & Recordon*, the defendant "engaged in willful copyright infringement targeted at [plaintiff], which [defendant] knew to be a resident of the [f]orum. Specifically, [plaintiff] alleged [defendant] individually targeted it by 'willfully, deliberately and knowingly' making 'commercial use of [plaintiff's] [w]ebsite,'" thereby placing [defendant] in competition with [plaintiff] in the field of elder abuse law." 606 F.3d 1124 (9th Cir. 2010).

Similarly, in *DEX Sys., Inc. v. Deutsche Post AG*, the Ninth Circuit exercised specific personal jurisdiction over a defendant accused of "intentional copyright infringement occurring on [plaintiff's] California servers" where plaintiff's "server had to be engaged and used for the software at issue to function and [defendant] had knowledge of this fact." 727 F. App'x 276, 278 (9th Cir. 2018). Moreover, "that the software was located on [plaintiff's] California server was not merely a fortuitous occurrence" because it "was located on California servers pursuant to an agreement reached by the parties." *Id.* Under such circumstances, where the defendant not only knew the location of the target server ahead of time but also actively procured its placement there, it is unsurprising that the court found "sufficient record evidence to establish that [defendant's] allegedly infringing conduct was expressly aimed at and occurred in California." *Id.* In contrast, ExpressVPN neither had foreknowledge of plaintiffs' locations nor agreed with them that they would use California-based VPN Servers.

Finally, *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021) is also inapposite. There, the defendant skincare company published ads specifically directed toward American consumers, such as: "ATTENTION USA BABES WE NOW ACCEPT afterpay [*sic*]." *Id.* at 978. This constituted an "intentional, explicit appeal to American consumers ***and no others***." *Id.* at 980 (emphasis added). As shown above, when viewed in context, ExpressVPN's advertisements did not target California consumers, and certainly not at the exclusion of everyone else—rather, those advertisements marketed the availability of VPN Servers in California as a selling point to a ***global*** customer base.

Plaintiffs also fail to explain how ExpressVPN's allegedly California-centric advertising "caus[ed] their] harm." *Gagnon v. Ridge Instrument Co.*, 2008 WL 11422488, at *3 n.3 (C.D. Cal. Feb. 29, 2008); *see Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 803 (9th Cir. 2004). To attempt to bridge the gap between this advertising and the alleged harms caused by a separate, static purchase and

checkout webpage, plaintiffs argue that the "point of ExpressVPN's ads was to sign up California consumers for these subscriptions. . . . So the ads caused foreseeable harm." Opp. at 3. But this conclusion does not follow from its premise. Even accepting, *arguendo*, that "the point of ExpressVPN's ads was to sign up California consumers," plaintiffs fail to explain how those ads caused harm, as the *Calder* test requires.

Plaintiffs do not allege, for instance, that they were influenced by or even saw the ads before they purchased ExpressVPN's services. *See Gagnon*, 2008 WL 11422488, at *3 n.3 ("Plaintiffs describe [d]efendants' phone calls and emails to California as the intentional acts at issue. The phone calls and emails did not cause harm to [p]laintiffs. To the extent that [p]laintiffs were harmed, they were harmed by [d]efendants' alleged breach of the alleged oral contract."). This case is thus unlike *Brayton*, where the defendant's conduct—copying the plaintiff's website design— bore a direct and clear relationship to the harms suffered by the plaintiff, including "harm to its business reputation" and decreased profits. 606 F.3d at 1131. Here, only the allegedly inadequate ARL disclosures (not ExpressVPN's ads) could have caused plaintiffs' injuries, and plaintiffs do not (and could not) allege those signup disclosures targeted or even mentioned California.

Plaintiffs' other authorities only highlight the inappropriateness of exercising personal jurisdiction under *Calder* here. In *Doe v. WebGroup Czech Republic, a.s.*, the Ninth Circuit stated that a "defendant causes harm" in a forum under the *Calder* test "when the ***bad acts that form the basis of the plaintiff's complaint occur in that forum.***" 93 F.4th 442, 456 (9th Cir. 2024) (cleaned up & emphasis added), *overruled in part on other grounds by Briskin*, 135 F.4th at 757 n.15. Even if ExpressVPN's alleged California-centric advertising could be construed as an act occurring in California, plaintiffs do not explain how ExpressVPN committed a "bad act" merely by marketing its services; nor do the advertisements, as opposed to ExpressVPN's

allegedly inadequate ARL disclosures, "form the basis" of plaintiffs' complaint and their claims for relief. *Id*.

Ultimately, plaintiffs' authorities concern the exercise of specific personal jurisdiction in two types of fact patterns. The first is where it is the **defendant** who affirmatively reaches into the forum to make unsolicited and harmful contact with the plaintiff, such as by publishing print or radio ads in the forum (*Rio Properties, Inc*) or reaching into the forum digitally to infringe on the copyright known to belong to a resident of the forum (*DEX Sys., Inc.*). The second is where the **consumer** seeks out and initiates contact with the defendant, and the defendant, fully aware of the consumer's location, targets its misconduct at that consumer—such as by installing tracking software on a device the defendant knew was located in a particular forum (*Briskin*) or reporting damaging credit information to credit bureaus about an individual already known to be located in the forum because that individual reached out and provided that information (*Hidalgo*). This case involves a distinct, third scenario, wherein the alleged wrongdoing—displaying supposedly insufficient ARL disclosures on a website—is not targeted at any forum and occurred simultaneously with plaintiffs' own initial outreach to ExpressVPN (*i.e.*, via their decision to visit the ExpressVPN website and purchase a subscription). Simply put, ExpressVPN did not direct any allegedly harmful conduct at California.

### 2. ExpressVPN's California VPN Servers

Plaintiffs' arguments predicated on ExpressVPN's California VPN Servers suffer from, among other defects, the same causation problem identified above: Plaintiffs fail to explain how ExpressVPN's purported maintenance of these VPN Servers caused plaintiffs any harm or why the servers are even relevant to a *Calder* analysis when the bases of plaintiffs' claims are the allegedly inadequate ARL disclosures hosted on ExpressVPN **Website Servers**, "[t]he physical location of" which "is not decided by or controlled by ExpressVPN but rather by the third-party

webhosting service provider hired by ExpressVPN to host the websites such that they are accessible globally." ECF No. 26-1, Buckley Decl. ¶ 19.

### 3. ExpressVPN's Third-Party Affiliate Marketing

Nor does ExpressVPN's alleged third-party affiliate marketing with Internet influencers establish *Calder* jurisdiction. As is true with respect to ExpressVPN's online advertisements, plaintiffs point to nothing in ExpressVPN's alleged influencer marketing that constitutes express aiming at California. Indeed, the only concrete example plaintiffs provide is an influencer video by the YouTuber "Geekman" using the phrase "Best California VPN Servers," Opp. at 5, but as already explained, this language does not target California. The alleged influencer marketing also suffers from the same causation problem as plaintiffs' alleged "ExpressVPN advertising" and "VPN Server" "buckets of intentional acts": Even if plaintiffs could somehow attribute the conduct of third-party affiliates to ExpressVPN (they cannot), plaintiffs simply do not allege that the harm they suffered was caused by anything a third-party affiliate said or did.

Furthermore, plaintiffs fail to allege that ExpressVPN exercised any editorial control over any location-specific (or even other) content of the influencers' advertisements; thus, to the extent any influencer statements could be deemed to target California, such statements cannot be imputed to ExpressVPN. *See L.A. Turf Club, Inc. v. US Racing*, 2025 WL 2019948, at *3 (C.D. Cal. May 15, 2025) ("unilateral activity of . . . a third party" is insufficient to connect a defendant to the forum state). Indeed, as ExpressVPN explains, "[t]o the extent, if any, that a third-party affiliate discusses or 'targets' a particular geographic location, such third-party affiliate is acting unilaterally in doing so." Declaration of Jack Buckley ¶ 5 (Nov. 20, 2025). At most, plaintiffs allege that ExpressVPN "reserves the right to view and approve" influencer content, Opp. at 5, but they do not allege that ExpressVPN actually exercised this right or reviewed any of the alleged influencer content at issue here. Plaintiffs' reliance on *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 (9th

Cir. 2011), is misplaced, as that case involved the defendant allegedly posting copyright-infringing content on its *own* website, so the "unilateral activity" doctrine did not pose an obstacle to jurisdiction—unlike here, and fatally so. *Id*. at 1221-23.

Or, as the YouTuber Geekman himself puts it: "I am affiliated, but not sponsored by any VPN provider. This means I might make money when you purchase paid services through the links provided and I might be able to offer discounts when available. Not being sponsored allows me to keep my own opinions and provide reviews and tutorials without bias. So, if you enjoyed the content consider using my affiliate links. All of my opinions on this channel are always my own!" Geekman, *Best California VPN Server – Get a California IP*, YouTube (Sept. 28, 2021), www.youtube.com/watch?v=lFYdhYjo7QQ (video description).

## II.   PLAINTIFFS FAIL TO ESTABLISH STATUTORY STANDING

Because plaintiffs do not dispute that they received exactly what they paid for when they signed up for ExpressVPN, they cannot establish the requisite loss of "money or property" for their UCL or FAL claims or "damage" under the CLRA. As the California Supreme Court observed in *Kwikset Corp. v. Superior Court*, a consumer has standing under California's consumer protection laws where he "value[s] what [he] actually received less" than "the money [he] parted with" or less than the product or service as it was advertised. 246 P.3d 877, 892 (Cal. 2011). There, the plaintiffs purchased locks falsely advertised as having been made in America, and the plaintiffs valued the foreign-made locks they received instead less than ones made in America. *Id.* Conversely, when Millar purchased one month of ExpressVPN's services for $12.95, *see* FAC ¶ 40, he demonstrated that he valued one month of VPN services as worth at least $12.95. Thus, although Millar incurred allegedly unwanted renewal charges thereafter, he always received services in exchange that were worth at least as much as the money he spent. The same holds true for Martinez's purchase of a yearly plan. *See* FAC ¶ 56.

Although plaintiffs do not dispute that the services they received were worth at least as much as they cost, plaintiffs insist that they would not have chosen to enter into their purchases had they known of the automatically renewing nature of the VPN subscriptions.  Opp. at 8.  Putting aside the credibility of this statement, plaintiffs' mere regret of having made these purchases cannot establish statutory standing when they cannot point to anything of material value that they lost.  The mere fact that "money has changed hands" is insufficient.  *Roz v. Nestle Waters N. Am., Inc.*, 2017 WL 132853, at *7 (C.D. Cal. Jan. 11, 2017).  Plaintiffs' reliance on *Mayron v. Google LLC,* 269 Cal. Rptr. 3d 86, 88, 91 (Ct. App. 2020) on this issue is misplaced.  There, the court **affirmed dismissal** of a complaint for lack of statutory standing, finding the plaintiff failed to allege that he would not have purchased services from Google had proper automatic-renewal disclosures been provided.  *Id.*  The court held that such an allegation was **necessary** to establish statutory standing, but it had no occasion to consider whether it would have been **sufficient** to establish standing if made.  Thus, *Mayron* sets forth only nonbinding dicta at most.

Plaintiffs attempt to distinguish *Warner* on the basis that the plaintiff there "did 'not allege that he did not want' the product," Opp. at 9 (quoting *Warner*, 105 F. Supp. 3d at 1094), whereas plaintiffs have alleged that they did not "expect, want, or consent to automatic renewal," FAC ¶¶53, 56.  But plaintiffs' quotation from *Warner* cuts out the critical language **"(at any price)"**—that is, when the quoted sentence is instead read in full, it states:  "Warner does not allege that he did not want Tinder Plus **(at any price)**, that Tinder Plus was unsatisfactory, or that Tinder Plus was worth less than what he paid for it."  105 F. Supp. 3d at 1095 (emphasis added).  In other words, an injury sufficient for statutory standing may well exist where a plaintiff pays **something** for a product or service that the plaintiff considers to be worth **nothing** or at least **less than** the amount paid—but there can be no statutory injury where equivalent (or greater) value is received in exchange for payment.  Accordingly, the court in *Warner* found that the allegation that the subscription "fee was auto-debited

despite the fact that [the plaintiff] had not authorized defendant to continue charging him"—the same allegation plaintiffs make here—does not suffice, as it does not impact the fundamental value proposition of the transaction. *Id* at 1088.

Nor is *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013) on point. There, the plaintiff purchased products that were falsely advertised as having sold at a higher price in the past, misleading consumers into believing the products had a higher monetary value than they really did. *Id.* Again, though, plaintiffs here do not argue that a month or year of ExpressVPN service is worth less than what they paid. Plaintiffs also rely on a series of non-binding district court decisions that they contend establish that their mere allegation that they would not have purchased ExpressVPN had they known of the automatic-renewal policies is sufficient to establish standing. Opp. at 8-9. These decisions are not persuasive here because none meaningfully explains what material value a plaintiff could conceivably be said to lose when he allegedly unwittingly subscribes to a service that bills him on a recurring basis for an amount that is less than or equal to the value of the service received.[3]

## III.   PLAINTIFFS FAIL TO ESTABLISH EQUITABLE JURISDICTION

Plaintiffs do not dispute that they seek the same amount of money in restitution and damages. MTD at 17-18. That establishes that the Court lacks equitable jurisdiction, for a plaintiff "cannot seek restitution . . . for the same money he would receive for his claims at law." *Smart v. Nat'l Collegiate Athletic Ass'n*, 2023 WL 4827366, at *11 (E.D. Cal. July 27, 2023); *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (dismissal of equitable claim warranted where plaintiff failed to "explain how the same amount of money for the exact same harm is inadequate or incomplete"). Plaintiffs' only argument to the contrary is that their CLRA claim contains "more stringent elements" than their equitable claims. Opp. at

---

[3]   Plaintiffs concede that they do not attempt to establish standing under the ARL's "unconditional gift" provision. Opp. at 9-10. And indeed, they cannot. MTD at 16-17.

10 (citation omitted).  In other words, plaintiffs' argument is that their legal remedies are "inadequate" because their legal claims face greater obstacles on the merits.

In so arguing, plaintiffs misstate the law.  The adequacy of a legal remedy does not turn on the probability of success of the underlying legal claim but whether the *remedy, if attained*, would suffice to make the plaintiff whole.  *See Nacarino v. Chobani, LLC*, 2021 WL 3487117, at *12 (N.D. Cal. Aug. 9, 2021).  The question is whether there is some "inherent limitation" on the remedy itself, not how likely the plaintiff is to secure that remedy.  *Id.*  Thus, a legal remedy is not "inadequate" where the plaintiff's "inability to obtain damages" would merely result from the claim's "failure on the merits."  *Id.* (rejecting argument that CLRA's legal remedies were inadequate merely because CLRA was "rooted in a different theory of liability" than equitable claims); *accord Roffman v. Rebbl, Inc.*, 2024 WL 4996063, at *1 (N.D. Cal. Dec. 4, 2024) (rejecting a similar argument and dismissing equitable claims under the UCL and FAL); *see also Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025) (plaintiffs' "failure to prove" their legal claim "does not make that remedy inadequate" (citation omitted)); *Guzman v. Polaris Indus.*, 49 F.4th 1308, 1313 (9th Cir. 2022) (adequate legal remedy existed even though legal claim was time-barred).[4]

## IV.    MILLAR REMAINS BOUND TO ARBITRATE

If the Court concludes it has jurisdiction over this matter, it should compel arbitration and stay the matter as to Millar.

### A.    <u>Millar Demonstrably Consented to Arbitration</u>

When Millar subscribed to ExpressVPN's service, ExpressVPN provided clear, conspicuous notice that doing so required him to agree to ExpressVPN's TOS, and

---

[4]  Plaintiffs' citation to the nearly 90-year-old case, *American Life Insurance Co. v. Stewart*, 300 U.S. 203 (1937) does not help them either.  That case involved insurance policies that became incontestable after a set period, depriving the insurer of any "remedy at law at all except at the pleasure of an adversary."  *Id.* at 215.  Plaintiffs do not argue they have no "remedy at law at all" but merely that their legal claims are more difficult to prove.

-12-

Case No. 8:25-cv-01273-FWS-DFM
Defendant's Reply in Support of its Motion to Dismiss the FAC and, in the Alternative, to Compel Arbitration

Millar affirmatively clicked the "Join Now" button signifying his unambiguous assent to that agreement, including its arbitration provision.  *See* ECF No. 26-1, Buckley Decl. ¶ 12.  A binding arbitration agreement was therefore formed.  In this litigation, however, Millar now wants to go back on his agreement to arbitrate any dispute.  In an attempt to provide himself cover to do so, Millar overcomplicates what is a remarkably straightforward analysis:  Whether, taking into account the totality of "the visual design of the webpages and the context of the transaction," "a reasonably prudent internet user would have seen" the "[n]otice of terms and conditions,"[5] and whether he took "some action, such as clicking a button or checking a box, that unambiguously manifests his . . . assent to those terms."[6]  The answer to both of these questions here is yes.

*First,* the visual design of ExpressVPN's website places the TOS disclosure— "By submitting this form, you agree to our Terms of Service"—against a white background, in a font size used throughout the page, located right below and next to the "Join Now" action button, and with the words "Terms of Service" brightly colored, underlined, capitalized, and obviously hyperlinked.  Opp. at 18.  Critical differences exist between the ExpressVPN TOS notice and the TOS notices that were found inadequate to unambiguously bind users in the cases cited by plaintiffs:

- In *Chabolla v. ClassPass Inc.*, the "Continue" button was separated from the TOS notice by the combination of:  (i) white space, (ii) a distinct blue "Sign Up with Facebook" button that is bigger than the diminutive TOS notice itself, and (iii) a stylized "—or—."  129 F.4th 1147, 1157 (9th Cir. 2025).  On the other hand, ExpressVPN's TOS notice is much closer to and located between the "Join Now" button and additional interactive payment option fields (which dynamically expand

---

[5]   *So v. Hyatt Corp.*, No. 2:25-CV-1298-AB-SSC, 2025 WL 2994995, at *5 (C.D. Cal. Aug. 25, 2025).

[6]   *Berman*, 30 F.4th 849, 856 (9th Cir. 2022).

when clicked)—with enough white space as to be readily identifiable but not so much as to be distant from the action button—making this area of the screen with the TOS notice part of the "user's natural flow."  *Id.*

Using *Chabolla*, plaintiffs also argue that there is a mismatch between the language of ExpressVPN's "***Join Now***" action button and the TOS notice language "***By submitting this form***, you agree to our Terms of Service"—that is, because the verb "join" is different from the verb "submit," a supposedly reasonable user could not discern that clicking "Join Now" constitutes "submitting this form."  Opp. at 20-21.  But even accepting this dubious premise,[7] *Chabolla* tellingly involved a multi-step, multi-webpage sign-up process, thereby obfuscating which of the various action buttons on each page, if any, would actually bind the user to the TOS—leaving the user guessing and unsure.  No such ambiguity exists here, where ExpressVPN's checkout flow consists of a single, streamlined webpage with a single, conclusive action button.  *See* Opp. at 18.

- In *Shultz v. TTAC Publ'g, LLC*, the court found that "the webpage design makes it exceedingly difficult to discern the significance of the hyperlink," because: (i) "[t]he phrase 'I agree to the terms and conditions' is in very small text, and is dwarfed by the large and colorful green 'Complete Purchase' button below it;" (ii) "[a]lthough the hyperlink to the Terms and Conditions is in light blue, it is not underlined, highlighted, in all caps, or otherwise set off from the page;" (iii) "[t]he checkout page also has what appears to be a promotional video playing in the top left corner of the webpage, and the volume appears to be at its maximum level;" and (iv) "[t]o the right of the terms and conditions hyperlink and 'Complete Purchase' button is further promotional material about the soon-to-be-purchased product."  2020 U.S.

---

[7]  *But see Chabolla*, 129 F.4th at 1159 ("[I]n *Patrick*, clicking a '***Place*** Order' button unambiguously manifested assent because the website explained that 'by ***submitting*** an order, the consumer 'confirms [he] . . . agree[s] to our privacy policy and terms of use.'" (emphases added)).

Dist. LEXIS 198834 at *4 (N.D. Cal. Oct. 26, 2020).  None of these factors applies here, as ExpressVPN's checkout page design was different in every material respect.

- In *Serrano v. Open Rd. Delivery Holdings, Inc.*, the TOS link was in the same font, size, and gray color as the surrounding text—the only difference being that the link was underlined (but also in gray).  The court found "the failure to identify the hyperlink to [d]efendant's Terms of Use by more than mere underlining [was] highly significant."[8]  666 F. Supp. 3d 1089, 1096 (C.D. Cal. 2023).  In contrast, ExpressVPN's TOS link is, as *Serrano* counsels, in "a contrasting font color . . . , which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.'"  *Id.* at *1097.

- In *Farmer v. Barkbox, Inc.*, the "lone [TOS] notice [was] printed small, light-colored font at the bottom of a page crowded with other graphics and text more likely to attract the user's attention," especially to the left side of the screen—away from the TOS notice on the right side—and including colorful images of a dog and stuffed animals.  2023 U.S. Dist. LEXIS 222435 at *6 (C.D. Cal. Oct. 6, 2023).  ExpressVPN's TOS notice appears on the left side of the screen, which is the same side to which the eyes are drawn, as that is also where the mandatory accordion payment fields and "Join Now" action button are located.

*Second*, in the context of today's modern era dominated by e-commerce and the proliferation of subscription services, the average consumer is more aware than ever of the ubiquitous presence of binding terms of service on every website.  It therefore strains credulity to think that Millar—or anyone—could buy something online, especially a subscription service, and somehow believe that no formal

---

[8]  And, in all events, Millar alleges his purported injury occurred **while his arbitration agreement was in place**. *Compare* FAC at ¶ 4 (alleging charges in September and October 2022), *with* Opp. at 25-26 (alleging he agreed to the new terms only **after** those charges, when he cancelled his subscription).  Thus, even were this an issue for the Court (it is not), Millar's argument is without merit.

contractual terms govern the transaction and the relationship between the consumer and the online service provider.  Where, as here, "it is undisputed the program's purpose is ongoing," and it "is undisputed [each plaintiff] underwent a full registration process to sign up," including having, for instance, "entered his name, email address, physical address, preferred language, and customer type; . . . then created a password for his . . . account; . . . and finally clicked the 'JOIN NOW" button to complete his registration," a reasonable consumer would understand that the transaction "contemplate[s] a continuing relationship," with respect to which "courts are more inclined to enforce hyperlinked agreements." *So v. Hyatt Corp.*, 2025 WL 2994995, at *5.  The Court should do the same here.

### B.    <u>Millar Further Agreed to Delegate Arbitrability Disputes</u>

"Under federal law, the incorporation of a particular set of arbitration rules—such as the ICDR rules—that provide for the arbitrator to decide questions of arbitrability 'constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability.'" *ASUS Computer Int'l v. InterDigital, Inc*, 2015 WL 5186462, at *3 (N.D. Cal. Sept. 4, 2015) (citation omitted).  Contrary to Millar's contention, "the majority of courts have concluded that" this rule indeed "applies equally to sophisticated and unsophisticated parties." *Rendon v. T-Mobile USA, Inc.*, 747 F. Supp. 3d 1314, 1319–20 (C.D. Cal. 2024), *reconsideration denied*, 2024 WL 5256491 (C.D. Cal. Nov. 4, 2024); *see also, e.g., Acosta v. Brave Quest Corp.*, 733 F. Supp. 3d 920, 928 (C.D. Cal. 2024) ("In the end, this Court agrees with those courts that have extended [this rule] to parties of all gradations of sophistication.").  The same result should follow here.

Seemingly recognizing this, Millar attempts to bootstrap his unconscionability challenges into attacks on the separate delegation of arbitrability agreement.  Opp. at 23-24.  However, Millar's contention that the chosen forum for the arbitration renders it unconscionable (*id.* at 22-24) "is not 'specific to the delegation provision'" and thus "[w]hether the forum selection clause is enforceable as to the contract as a whole is

for the arbitrator to decide." *Gountoumas v. Giaran, Inc.*, 2018 WL 6930761, at *11 (C.D. Cal. Nov. 21, 2018) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 73 (2010)).    The same is true of Millar's argument that ExpressVPN purportedly "waived" its right to arbitrate by updating its online terms to remove the arbitration provision, Opp. at 25-26—this is not an issue of "waiver," but instead a dispute about the scope and enforceability of the arbitration agreement, which is plainly delegated to the arbitrator.  *ASUS Computer Int'l*, 2015 WL 5186462 at *4 (recognizing the ICDR rules delegate to the arbitrator disputes concerning the "scope or validity of the arbitration agreement").

Millar's remaining "unconscionability" arguments depend on a misunderstanding of the AAA-ICDR rules.  He contends the rules would impose a "$1,450 filing fee," a "$1,150" "Final Fee," and "$1,000 an hour" arbitrator fees that render arbitration of any dispute prohibitively expensive.  Opp. at 21-22 (internal quotation marks omitted).  However, the ICDR is just the international branch of the AAA.[9]  Accordingly, the AAA Consumer Arbitration Rules—which are "deemed" to be part of *any* arbitration agreement where the parties "have provided for arbitration by the American Arbitration Association," as here—apply,[10] including their incorporation of the consumer arbitration fee schedule, which requires only a $225 filing fee (less than the court fees Millar already chose to incur here) and otherwise allocates the costs of arbitration to the business.[11]  Accordingly, Millar's arguments as to fees are entirely misplaced, and to the extent he contends the arbitration

---

[9]    ICDR, *About ICDR*, www.icdr.org/about_icdr ("The ICDR®—International Centre for Dispute Resolution®—is the international division of the largest arbitral institution in the world, the American Arbitration Association.").

[10]    AAA, *Consumer Arbitration Rule R-1*, www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf.

[11]    AAA, *Consumer Mediation Fee Schedule*, www.adr.org/media/3uofn4lu/consumer_rules_and_mediation_procedures_feeschedule.pdf.

agreement for some reason overrides this consumer-favorable fee allocation, that is an issue for the arbitrator to address.

## V.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE THEIR CLAIMS

### A.    <u>Plaintiffs' Fraud Claims Fail the Reasonable Consumer Test</u>

Because ExpressVPN repeatedly, explicitly, and visibly disclosed its automatic-renewal policies, plaintiffs cannot show that "members of the public are likely to be deceived" by ExpressVPN's practices. *Rutter v. Apple Inc.*, 2022 WL 1443336, at *8 (N.D. Cal. May 6, 2022) (citation omitted). This included ExpressVPN's use of language on the order page that makes the recurring nature of its subscriptions blatantly obvious—for example, "1 Month . . . $12.95 *per month* . . . *Billed every month*;" "12 Months, $8.32 *per month* . . . *Billed every 12 months*;" and "ExpressVPN 1-month plan*, billed monthly* ($12.95*/month*)." Opp. at 18 (emphases added). No reasonable consumer would fail to understand that they were purchasing a renewing subscription service.

Nevertheless, plaintiffs argue that ExpressVPN violated the ARL, and that plaintiffs therefore presumptively satisfy the "reasonable consumer" test. Opp. at 11. They also argue that whether the reasonable consumer test has been satisfied is a question of fact. *Id.* But even assuming, *arguendo*, that plaintiffs were correct in arguing that ExpressVPN violated the ARL, the presumption they identify is rebuttable—including at the pleading stage. Where a court may "conclude as a matter of law that members of the public are not likely to be deceived, dismissal is appropriate." *Warner*, 105 F. Supp. 3d at 1092 (cleaned up); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (affirming dismissal of CLRA claim where "promotions expressly and repeatedly state the conditions which must be met in order to win" and the language was not "hidden or unreadably small" and "appear[ed] immediately next to the representations it qualifies," such that a "person of ordinary intelligence" would not be misled (internal quotation marks omitted)). Plaintiffs hide behind their presumption and do not meaningfully engage with the disclosures

themselves—which lead to the inescapable conclusion that a reasonable consumer would not be misled.

**B.    Plaintiffs Fail to State a Violation of the ARL**

In their Opposition, plaintiffs tellingly fail to identify or otherwise detail any specific ARL provision that ExpressVPN allegedly violated, relying instead on the conclusory assertion that they "plausible plead" that ExpressVPN "violates the ARL in nearly every way." *See* Opp. at 10-12.  But a closer look at the FAC reveals that this is not the case.

For instance, plaintiffs complain that ExpressVPN did not supply a "clear and conspicuous" disclosure of its ARL policies.  FAC ¶ 45 (quoting Cal. Bus. & Prof. Code § 17601(3)).  But those policies are contained in the TOS hyperlink that is in green, underlined, and easily seen against the checkout flow's white background.  *Id.* ¶ 43; *see* Cal. Bus. & Prof. Code §17601(3) (disclosure may be "in contrasting type, font, *or* color to the surrounding text of the same size" (emphasis added)).

Plaintiffs also complain that ExpressVPN "fails to disclose 'that the amount of the charge will change, *if that is the case*, and the amount to which the charge will change, if known.'"  *Id.* ¶ 46 (quoting Cal. Bus. & Prof. Code § 17601(a)(2)(C)) (emphasis added).  But plaintiffs do not even allege that ExpressVPN's fees were subject to change when they signed up (*e.g.*, a promotional price in the first period and a different price in the renewal period).  If they weren't, then there was nothing to disclose.

Plaintiffs further complain that "ExpressVPN fails to require the user to press a button confirming that the user is consenting to automatic renewal."  *Id.* ¶ 47.  But the checkout flow's statement that, "[b]y submitting this form, you agree" to the hyperlinked TOS, which set forth the automatic-renewal policies, plainly puts a reasonable consumer on notice that they are consenting to automatic renewal by clicking "Join Now."  *Id.* ¶ 43.  Plaintiffs similarly complain that ExpressVPN fails to disclose "that the subscription will continue until the consumer cancels and fail[s]

to include a description of the cancellation policy." *Id*. ¶ 48. But this information, too, is all set forth in the TOS that is hyperlinked within the checkout flow. ECF No. 26-2.

Finally, plaintiffs contend that ExpressVPN's purchase acknowledgements fail to state that "charges will automatically recur until the consumer cancels" or provide information about the "cancellation policy." FAC ¶ 50. But all the ARL requires is that the acknowledgment provide this information "in a manner that is capable of being retained by the consumer." Cal. Bus. & Prof. Code § 17602(a)(3). Plaintiffs provide an acknowledgment email that Millar alleges he received from ExpressVPN after making his purchase, and that acknowledgment plainly contains a hyperlink to ExpressVPN's website, where all the information plaintiffs complain is absent may be found and was available at all relevant times. FAC ¶ 49. Thus, the acknowledgement email adequately incorporated all relevant information in a manner that is "capable of being retained by the consumer."

**C.    Plaintiffs' Other Claims Merely Repackage Their Fraud Claims**

Plaintiffs do not dispute that their claims under the UCL's "unlawful" and "unfair" prongs "merely repackage the same underlying conduct, sounding in fraud, for which [they] sued under the 'Deceptive' prong." MTD at 21. Plaintiffs instead argue that "the reasonable consumer test does not apply" to claims under the UCL's "unlawful" prong—but, in so arguing, they completely ignore *Eidmann v. Walgreen Co.*, which specifically held that a claim under the UCL's "unlawful" (or "unfair") prong may not survive when it rests on the same underlying conduct found inadequate to support a claim arising in fraud. 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021).

Plaintiffs cite the unpublished *Bruton v. Gerber Products Co.*, 703 F. App'x 468 (9th Cir. 2017), but that decision did not involve the ARL and is neither binding nor persuasive. The court opined that "[t]he best reading of California precedent is that the reasonable consumer test is a requirement under the UCL's unlawful prong only when it is an element of the predicate violation." *Id.* at 471-72. But neither of

the two intermediate appellate court cases *Bruton* cited with respect to this proposition considered whether a claim under the "unlawful" (or "unfair") prong of the UCL may be maintained when the underlying conduct arises in fraud, as here, and the reasonable consumer test is not satisfied, also as here. *See id.* It would undermine the UCL's statutory scheme and the purposes of the reasonable consumer test to permit plaintiffs to use the "unlawful" (and/or "unfair") prong merely to skirt the application of the reasonable consumer test to alleged conduct that they do not dispute fundamentally sounds in fraud.

## CONCLUSION

For the foregoing reasons, the Court should dismiss these proceedings for lack of jurisdiction and, in the alternative, compel Millar's claims to arbitration.

DATED:  November 21, 2025

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By */s/ Stephen A. Broome*
    Stephen A. Broome (Cal. Bar No. 314605)
    stephenbroome@quinnemanuel.com
    John W. Baumann (Cal. Bar No. 288881)
    jackbaumann@quinnemanuel.com
    Rex N. Alley (Cal. Bar Bo. 346525)
    rexalley@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
    Telephone:  (213) 443-3000
    Facsimile:  (213) 443-3100

    Nicolas G. Keller (N.Y. Bar No. 5549522)*
    nicolaskeller@quinnemanuel.com
    295 5th Avenue, 9th Floor
    New York, New York 10016
    Tel:  (212) 849-7000
    Fax:  (212) 849-7100
    (*Admitted *Pro Hac Vice*)

    *Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Express Technologies, Ltd., certifies that this brief complies with the 7,000 word limit of L.R. 11-6.1 because it contains 6,833 words (including headings, footnotes, and quotations but excluding the caption, the table of contents, the table of authorities, the signature block, this certification, and any indices and exhibits).

DATED:  November 21, 2025                    */s/ Stephen A. Broome*
                                            Stephen A. Broome